In re Roger W. HARLOFF d/b/a Roger Harloff Farms d/b/a Hancock Farms d/b/a Johnson Farms a/k/a Immokalee Farm, Debtor.

Lease Corporation of America, LCA,

v.

Roger W. Harloff, Defendant.

Bankruptcy No. 98–05120–8P1.
Adversary No. 98–353.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Aug. 30, 2001.

Robert A. Soriano, Tampa, FL, Jeffrey S. Sabin, Schulte Roth & Zabel, New York City, for debtor.

Steven N. Lippman, Fort Lauderdale, FL, for plaintiff.

John A. Anthony, Tampa, FL, for Larry S. Hymen.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY,
Bankruptcy Judge.

THE MATTER under consideration in the above-captioned adversary proceeding is a Second Amended Complaint filed by Lease Corporation of America (LCA) to except debt from discharge pursuant to 11 U.S.C. § 523 and Federal Rules of Bank-ruptcy Procedure (F.R.B.P.) 4007 and 7001 *et seq.* The Complaint contains two counts. In its Complaint LCA seeks to obtain a determination that the debt claimed to be owed by Roger W. Harloff (Debtor) is excepted from the overall protection of the general discharge.

Count I of LCA's Second Amended Complaint is based on 11 U.S.C. § 523(a)(2)(B) and claims that the Court should except Debtor's debts to LCA from Debtor's discharge because Debtor made materially false written representations to LCA to induce LCA to enter into certain Leases and based the guarantees on the Leases by Debtor. Count II is based on 11 U.S.C. § 523(a)(6) and states that the Court should except Debtor's debts to LCA since Debtor's conduct was willful and malicious and caused injury to LCA. Debtor filed an Answer stating a general denial of the claims.

It is LCA's contention that the Leases and Lease Application, which constitute a statement in writing respecting the debtor's or an insider's financial condition, contain materially false statements concerning Debtor's and Packing, Inc.'s, financial condition. Therefore, the liability of the Debtor by virtue of his guaranty is within the exception of § 523(a)(2)(B).

The facts relevant to the resolution of the claims under consideration as they appear from the stipulation by the parties, testimony of witnesses and the documentary evidence introduced and admitted into evidence can be summarized as follows:

On March 31, 1998, Debtor commenced this case by filing a voluntary Petition for Relief under chapter 11 of the Code. LCA is a finance leasing company providing quick financing to customers desiring to lease equipment needed in the operation of their businesses from their chosen vendors (Transcript, Deposition of Dirk Tischer,

general counsel of LCA, Lease Corporation of America [Tischer Transcript], p. 8). Packing, Inc. submitted its Lease Application on February 12, 1998 (LCA's Exh. 1) (Lease Application).

Because of expedited and quick financing, LCA allowed an abbreviation of some of its credit investigation processes. Instead, LCA relies primarily on certain representations provided by the lessees when they submit their Lease Application (Tischer Transcript, p. 9).

LCA's claim against Debtor is in the approximate amount of $16,000.00. It arises out of two leases to Roger Harloff Packing, Inc. (Packing, Inc.) of certain radio equipment purchased by the vendor, BCI Communications, Inc. (BCI). The first lease was entered into on or about February 18, 1998. LCA and Roger Harloff Packing, Inc. (Packing, Inc.) entered into a lease agreement for financing the purchase of certain radio equipment (LCA's Exh. 2) (First Lease), by which Packing, Inc. leased from LCA equipment described in the First Lease. On or about February 18, 1998, Debtor entered into a guaranty, whereby Debtor guaranteed the obligations of Roger Harloff Packing, Inc. under the First Lease.

The second lease was entered into on or about March 5, 1998. LCA and Packing, Inc., entered into a second lease for additional radio equipment (LCA's Exh. 3) (Second Lease) (the First and Second Lease are collectively referred to as Leases), by which Packing, Inc., leased from LCA the equipment described in the Second Lease. The lease form is identical to the first form and, once again, included a guarantee whereby Debtor guaranteed the obligations of Packing, Inc., under the Second Lease.

In connection with the Leases, Packing, Inc. submitted its Lease Application dated February 12, 1998 (LCA's Exh. 1). Debtor did not execute the Lease Application.

Rather, it bears his stamped signature, not his actual signature. The Lease Application contains certain financial information regarding Packing, Inc., and indicated it has an approximate net worth of $7,871,000.00 and an approximate net profit after taxes for 1997 of $400,000.00. It also indicated that Debtor received an annual personal income of $500,000.00. BCI submitted the Lease Application to LCA as part of the process for obtaining approval of the lease.

Consistent with their general policy, after checking over the Lease Application, LCA orders a Dun & Bradstreet (D & B) to verify the credit history of the company and a TRW (Experian) report to check the credit history of an individual consumer (Tischer Transcript, p. 17). Then they look at the income of the guarantor and the income and worth of the lessee, and make a determination to grant the financing (Tischer Transcript, p. 18). For a lease of this type, without any trouble spots on the TRW or the D & B, 15 to 20 minutes would typically be spent in making a credit determination (Tischer Transcript, p. 20). LCA claimed to have relied on the Lease Application. However, in this case, additional information was needed (Tischer Transcript, p. 9). There were a number of tax liens on Packing, Inc., and to ensure that the terms of the tax liens were being met, they requested backup information to verify that payments were being made regularly to the IRS (Tischer Transcript, p. 10).

The primary area of concern in this case was that the tax liens that would have potentially killed the transaction (Tischer Transcript, p. 18). Because of the tax liens reflected on the D & B (Tischer Depo., Exh. 5), the Leases required more than the usual 15–20 minute review for approval. However, because of its company policy to provide expedited and quick financing, the Leases were approved.

Furthermore, on the TRW, Debtor had a National Risk Code of 497, which reflects a poor payment history (Tischer Depo. Exh. 6; Tischer Transcript, p. 49). A good score would be under one hundred (Tischer Transcript, p. 49). Since Debtor was the guarantor on the Leases, this poor rating should certainly have affected the decision of whether or not to approve the Leases, guaranteed by someone with such a poor credit history.

Although the record indicates that a financial statement of Packing, Inc. was requested (Tischer Transcript, p. 18), there is nothing in this record which indicates that LCA used it in making its decision to lease the equipment to Packing, Inc. There is also nothing in the record which indicates that LCA requested or considered a personal financial statement of the Debtor or his income tax returns. Furthermore, there is nothing in the record which indicates that Debtor had ever before leased equipment from LCA or that they had a business relationship prior to February 1998.

The Leases included Paragraph 2:

LESSEE'S AND GUARANTOR'S WARRANTIES TO LESSOR: Lessee and any Guarantor(s) expressly represent and warrant to Lessor, and Lessor relies on the fact that . . . f) financial information and other statements provided to Lessor are accurate and correct, and will be updated upon Lessor's request during the term of the Lease; g) said parties are currently meeting all debts as such come due . . .

Debtor was the sole shareholder and President of Packing, Inc. Debtor maintained that he was not aware of the contents of the Lease Application and did not participate in its preparation. He has acknowledged that he generally authorized it and other items to be submitted to LCA or its agent.

Packing, Inc. is in default under both Leases and Debtor is in default under each of the Guarantees, having failed to make any of the monthly rent payments due required by the Leases (Tischer Transcript, p. 28). It is without any serious dispute that Debtor did not have annual income of $500,000.00, and no evidence that he ever has paid his debts as they came due. Packing, Inc. was also not paying its debts as they came due and certainly did not have an approximate net worth of $7,871,000.00. Rather, Packing, Inc., had a negative cash balance as of September 30, 1997, and an equity of an amount far less than the $7,871,000.00 approximate net worth as set forth in the Lease Application (Tischer Depo. Exh. 7). All this leaves no doubt that the information furnished to LCA was baseless and false.

These are the relevant facts in the above-captioned Adversary Proceeding which, according to the Plaintiff, LCA, is sufficient to prevail and the debt should be excepted from discharge pursuant to Count I under § 523(a)(2)(B), and Count II under § 523(a)(6).

Section 523(a)(2)(B) states that a "discharge under section . . . 1141 . . . of this title does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by use of a statement in writing that is materially false; respecting the debtor's or an insider's financial condition; on which the creditor to whom the debtor is liable for such money, property, services, *or credit reasonably relied;* and that the debtor caused to be made or published with intent to deceive." 11 U.S.C. § 523(a)(2)(B) (emphasis added).

Section 523(a)(2)(B) requires the creditor to prove that it reasonably, as opposed to justifiably, relied on the written statement at issue. *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351

(1995). In *Field v. Mans, supra,* the Supreme Court discussed the reason for requiring a greater burden of proof on creditors seeking to except their claim from discharge under § 523(a)(2)(B) than those relying on § 523(a)(2)(A):

> The House Report on the Act suggests that Congress wanted to moderate the burden on individuals who submitted false financial statements, not because lies about financial condition are less blameworthy than others, but because the relative equities might be affected by practices of consumer finance companies, which sometimes have encouraged such falsity by their borrowers for the very purpose of insulating their own claims from discharge.

*Field v. Mans,* 516 U.S. at 76–77, 116 S.Ct. 437. Therefore, LCA has the burden of proving that it *reasonably* relied on the Lease Application containing false information.

■ Whether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances. Among the circumstances that might affect the reasonableness of a creditor's reliance are (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations. *BancBoston Mortgage Corp. v. Ledford (In re Ledford),* 970 F.2d 1556, 1560 (6th Cir.1992); *See also Martin v. Bank of Germantown (In re Martin),* 761 F.2d 1163, 1166–67 (6th Cir.1985) (holding that

the bank did not unreasonably fail to make an adequate investigation of debtors' financial condition so as to preclude dischargeability based on obtaining loan by use of materially false financial statement where loan was small, i.e., $2,500, in comparison to claimed net worth of $100,000, and lending bank had prior dealings with debtors leading the bank to believe that the debtors were reliable and the bank had obtained a credit report).

■ As concerns the existence of a "red flag," "[a] lender cannot claim reasonable reliance on a financial statement that the lender knows is inaccurate or incomplete—particularly where the lender has information in its own files that confirms the inaccuracies or shows the need for further investigation or confrontation with its customer." *Fifth Third Bank v. Collier (In re Collier),* 231 B.R. 618, 624 (Bankr. N.D.Ohio 1999) (citing *Heinold Commodities & Securities, Inc. v. Hunt (In re Hunt),* 30 B.R. 425, 450 (M.D.Tenn.1983)); *See also IFG Leasing Co. v. Vavra (In re Harms),* 53 B.R. 134, 143 (Bankr.D.Minn. 1985) (holding that creditor did not reasonably rely on debtor's financial statement when creditor obtained a Dun & Bradstreet report during its credit investigation which indicated that the values of certain real estate assets listed in debtor's financial statement were inflated).

■ For the reasons mentioned above, the D & B report giving LCA notice of the tax liens, Inc., the TRW Report showing that Debtor, individually, had a poor credit rating and the A grade notwithstanding all this negative information, was more than sufficient to raise "red flags" which would have required a prudent lender to conduct additional investigation. Furthermore, since LCA and Debtor did not have an existing relationship prior to these Leases, LCA had even more reason to investigate further rather than rely solely on the Lease Application. The reliance on the

facts stated in the Lease Application was far from a satisfactory basis to establish reasonable reliance. This Court is satisfied that LCA did not satisfy its burden, and that its reliance on the Lease Application was not reasonable. Therefore, Count I pursuant to 11 U.S.C. § 523(a)(2)(B) shall be dismissed with prejudice.

Count II of the Second Amended Complaint is based on 11 U.S.C. § 523(a)(6). Section 523(a)(6) provides that a "discharge under section ...1141 ... of this title does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). This Court is satisfied that there has been no evidence presented of malicious injury by the Debtor to support this claim. Therefore, Count II shall be dismissed with prejudice.

A separate final judgment shall be entered in accordance with the foregoing.