**Alan D. KOSINSKI, Debtor.**

**Steven B. Douglas, Plaintiff–Appellee,**

**v.**

**Alan D. Kosinski, Defendant–Appellant.**

**BAP No. MB 09–037.**
**Bankruptcy Case No. 06–12691–JNF.**
**Adversary Proceeding No.**
**06–01400–JNF.**

United States Bankruptcy Appellate Panel for the First Circuit.

March 1, 2010.

Ann Brennan, Esq., on brief for Defendant–Appellant.

William F. Spallina, Esq., on brief for Plaintiff–Appellee.

Before HAINES, VAUGHN, and TESTER, United States Bankruptcy Appellate Panel Judges.

VAUGHN, Bankruptcy Judge.

Alan D. Kosinski ("Kosinski") appeals from the bankruptcy court's judgment in favor of Steven B. Douglas ("Douglas") in which it: (1) determined that the debt owed Douglas on account of his investment in Kosinski's nightclub was nondischargeable pursuant to § 523(a)(2)(B);[1] (2) allowed Douglas' post-trial motion to amend his complaint to specify alternative counts under §§ 523(a)(2)(A) and (a)(2)(B); and (3) declined to address Douglas' alternative § 523(a)(2)(A) claim. For the reasons set forth below, we conclude that the bankruptcy court erred in finding that Douglas had established all of the elements necessary to except a debt from discharge under § 523(a)(2)(B). We also conclude that the bankruptcy court did not err in allowing Douglas' post-trial motion to amend his complaint to specify alternative counts under §§ 523(a)(2)(A) and (a)(2)(B). Because the bankruptcy court did not assay the merits of the § 523(a)(2)(A) claim, we **REMAND** so it may do so.

## BACKGROUND

### I. The bankruptcy proceedings

Kosinski filed a chapter 7 petition in August, 2006, and received a discharge in April, 2007. In October, 2006, Douglas filed a one-count complaint against Kosinski seeking a determination of nondischargeability under § 523(a)(2) generally. As grounds, Douglas alleged that Kosinski obtained money from him by making false representations about the financial condition of Boston Waves, LLC ("Boston Waves") and Pavilion Realty Trust (a Massachusetts nominee trust), two entities for which Kosinski served as manager and trustee.

Following a trial, Douglas, as ordered by the bankruptcy court, filed a motion pursuant to Rule 15 seeking to file an amended two-count complaint to except the debt from discharge under either § 523(a)(2)(A) or § 523(a)(2)(B) (the "Motion to Amend"). Kosinski objected. In an order (the "Order Regarding Dischargeability") and accompanying opinion (the "Opinion"), the bankruptcy court granted the Motion to Amend, determined that Kosinski was personally liable for the debt, and that the debt was nondischargeable pursuant to § 523(a)(2)(B). The bankruptcy court also held that because Douglas satisfied the required elements for nondischargeability under § 523(a)(2)(B), it did not need to address Douglas' § 523(a)(2)(A) claim. After an evidentiary hearing on damages, the bankruptcy court entered a judgment

---

**1.** Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific statutory sections are to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub.L. No. 109–8, 119 Stat. 23, 11 U.S.C. §§ 101, *et seq.* All references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure, and all references to "Rule" are to the Federal Rules of Civil Procedure.

against Kosinski in the amount of $181,099 (the "Judgment"). Kosinski appealed.

## II. The bankruptcy court's factual findings[2]

Kosinski is a self-proclaimed millionaire, specializing in real estate investing. In the 1980s and 1990s, Kosinski purchased and sold hundreds of properties, borrowing money from private investors and nominee realty trusts to finance these purchases. In the 1990s, he began conducting real estate investment seminars and courses advocating the use of trust instruments to protect assets from creditors. Kosinski also ran a real estate investors' group.

In 2003, Kosinski, as trustee of Pavilion Realty Trust, entered into an agreement with Harold Nabhan ("Nabhan") to lease a 55,000 square foot building located on pilings on Salisbury Beach in Salisbury, Massachusetts (the "property").[3] Pavilion Realty Trust, in turn, sublet a portion of the building to Boston Waves, a limited liability company which Kosinski formed in the spring of 2003 for the purpose of operating a nightclub/restaurant on the property. Kosinski had no experience operating a nightclub or restaurant, but he believed that the property had great potential as a nightclub. To further his development plans for the property, Kosinski solicited money (totaling at least $350,000) from numerous private investors to finance substantial improvements to the property and fund Boston Waves' business operations.[4] For the most part, Pavilion Realty Trust borrowed money and then transferred it to Boston Waves. Unfortunately, the nightclub operation struggled from the outset. Kosinski had problems securing a seasonal liquor license for the 2003 season and, as a result, Boston Waves failed to generate much income that year.[5]

Like many of the other private investors, Douglas met Kosinski at one of his real estate seminars. In early 2004, after reviewing a leaflet detailing Kosinski's business venture in Salisbury, Douglas contacted Kosinski to discuss the Salisbury Beach project. Kosinski informed Douglas of, among other things, his development plans for the Boston Waves nightclub and restaurant, including his rehabilitation of and improvements to the facility, and that he and Christopher Florek had spent close to a million dollars in cash on the project.[6] Following one quick trip to Salisbury to view the property, Douglas met Kosinski at the Boston Waves club on February 12, 2004, and took a tour of the premises. Before Douglas traveled to Salisbury for the tour, Kosinski's assistant sent him, via an e-mail attachment, a document entitled

2. The parties do not dispute the bankruptcy court's factual findings and, therefore, we borrow much of the background directly from the Opinion.

3. Nabhan operated a nightclub at the property for a number of years until it closed in 2001 due to a decline in business.

4. For example, throughout the spring of 2003, Kosinski, in his capacity as manager of Boston Waves and as trustee of Pavilion Realty Trust, executed numerous short-term, unsecured promissory notes in favor of these private investors. Several of these private investors, who testified at trial, were never repaid

in full. All but one received no payments at all.

5. Boston Waves' receipt ledgers showed that it generated less than $13,000 in revenue from its restaurant and approximately $10,000 from its "A–Bar 1" for the period between July and December, 2003.

6. Christopher Florek was Kosinski's partner in a brokerage franchise known as Exit Realty. He testified that he made no personal loans to Pavilion Realty Trust or Boston Waves, although he caused Exit Realty to write checks to Pavilion Realty Trust.

"Profit/Loss Sheet 4/1/2004 through 3/30/2005" (the "Projection"), which purportedly forecasted the earning capacity of Boston Waves. After identifying the projected gross profit and total operating expenses for the applicable twelve-month period, the Projection showed an operating profit of over a million dollars at the end of twelve months. Significantly, although the Projection had a line entry for "Loans" at the top (not in the section related to expenses), the entries for loan repayment amounts were blank. According to Douglas, Kosinski informed him that he obtained the projected numbers from speaking with Nabhan, who had operated a nightclub at the same location. Kosinski also told Douglas his investment would be secured by hard assets, including such items as the sound system and furniture, which Kosinski valued at $400,000. Although Douglas did question Kosinski about the numbers utilized in the Projection, he did not ask for any supporting documentation, seek any security for his loan, or otherwise conduct any due diligence.

Douglas testified that based upon the tour, his discussions with Kosinski, and the Projection, he told Kosinski he was willing to invest in the project, and he delivered a bank treasurer's check to Kosinski made payable to the Pavilion Realty Trust in the sum of $75,000. Kosinski, as trustee of Pavilion Realty Trust and manager of Boston Waves, executed a promissory note in favor of Douglas. Although Douglas received several erratic payments from Kosinski under the promissory note, they stopped after September, 2004.

At trial, Nabhan reviewed the Projection. He described the numbers utilized by Kosinski as "grossly exaggerated." Additionally, he testified that the wholesale purchase price of liquor was "way out of line" with the gross revenue that liquor sales would produce, that tax liabilities were seriously understated, and that the income from the parking lot was seriously overstated. He also testified that he forgave a portion of the rent, that Pavilion Realty Trust was about $25,000 behind in its rent payments in 2003, and that Pavilion Realty Trust failed to make all its rent payments in 2004. He added that Kosinski "vacated the premises on September 9, 2004, in the morning hours in the dark of night and took with him as much personal property as he could move into [sic] with two trucks," leaving the premises in a disordered state with papers strewn everywhere. Kosinski testified that Boston Waves subsequently filed a voluntary Chapter 7 petition.

### *JURISDICTION*

■ Before addressing the merits of an appeal, the Panel must determine that it has jurisdiction, even if the issue is not raised by the litigants. *See Boylan v. George E. Bumpus, Jr. Constr. Co., Inc. (In re George E. Bumpus, Jr. Constr. Co., Inc.)*, 226 B.R. 724, 725–26 (1st Cir. BAP 1998). The Panel has jurisdiction to hear appeals from: (1) final judgments, orders and decrees; or (2) with leave of court, from certain interlocutory orders. 28 U.S.C. § 158(a); *Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.)*, 218 B.R. 643, 645 (1st Cir. BAP 1998). A decision is considered final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment," *id.* at 646 (citations omitted), whereas an interlocutory order "only decides some intervening matter pertaining to the cause, and requires further steps to be taken in order to enable the court to adjudicate the cause on the merits." *Id.* (quoting *In re Am. Colonial Broad. Corp.*, 758 F.2d 794, 801 (1st Cir. 1985)). Although the Order Regarding Dischargeability was interlocutory when

entered because it did not determine the damage amount, it became reviewable once the bankruptcy court entered the Judgment. See *Tringali v. Hathaway Mach. Co., Inc.*, 796 F.2d 553, 559 (1st Cir.1986) (noting that entry of a final, appealable order enables appellant to request review of earlier nonfinal decisions upon which the final decision rests).

## STANDARD OF REVIEW

■ The Panel generally reviews findings of fact for clear error and conclusions of law *de novo*. *See TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir.1995); *Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.)*, 43 F.3d 714, 719 n. 8 (1st Cir.1994). Determinations regarding elements of an action under § 523(a)(2) are findings of fact reviewed for clear error. *See Lentz v. Spadoni (In re Spadoni)*, 316 F.3d 56, 58 (1st Cir.2003) (applying clearly erroneous standard to findings of justifiable reliance and *de novo* review to the definition of the standard); *Palmacci v. Umpierrez*, 121 F.3d 781, 785 (1st Cir.1997) (explaining that determination of fraudulent intent is a question of fact); *Century 21 Balfour Real Estate v. Menna (In re Menna)*, 16 F.3d 7, 11 (1st Cir.1994) (explaining that determination of reasonable reliance is an issue of fact), *overruled on other grounds by Field v. Mans*, 516 U.S. 59, 70–71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). A finding is clearly erroneous when, although there is evidence to support it, the Panel is left with the definite impression that a mistake has been made. *See Patriot Paper Corp. v. Travelers Ins. Co. (In re Neponset River Paper Co.)*, 231 B.R. 829, 830–31 (1st Cir. BAP 1999). Where findings are based on the credibility of witnesses, even greater deference is accorded to the trial court's findings. *See* Fed. R. Bankr.P. 8013; *Rodriguez–Morales v. Veterans Admin.*, 931 F.2d 980, 982 (1st Cir.1991).

■ An appellate court reviews a bankruptcy court's decision to allow an amendment of the pleadings under Bankruptcy Rule 7015(b) and Rule 15(b) for an abuse of discretion. *See Interface Group–Nevada v. TWA (In re TWA)*, 145 F.3d 124, 141 (3d Cir.1998); *Woodcock v. Chemical Bank, NYSHESC (In re Woodcock)*, 45 F.3d 363, 368 (10th Cir.1995); *see also Nickless v. Conley (In re Byers)*, 304 B.R. 1, 7 (1st Cir. BAP 2004) ("Ordinarily, an appellate tribunal accords 'significant deference' to the trial judge's decisions on Rule 15(b) motions.").

## DISCUSSION

### I. Nondischargeability Under § 523(a)(2)

■ In general, after an individual debtor files for chapter 7 bankruptcy, the bankruptcy court discharges all of the debtor's pre-existing obligations, absent the applicability of a statutory exception. *See* 11 U.S.C. § 523(a) (identifying nineteen statutory exceptions to discharge). Because exceptions to discharge are narrowly construed in favor of the debtor in an effort to further the "fresh start" policy underlying the Bankruptcy Code, the creditor asserting an exception to discharge must show that its claim "comes squarely within an exception enumerated in Bankruptcy Code § 523(a)." *See In re Menna*, 16 F.3d at 9; *see also McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001); *Palmacci*, 121 F.3d at 786.

■ Pursuant to § 523(a)(2), some debts incurred as a result of the debtor's fraudulent actions or statements are excepted from discharge. *See* 11 U.S.C. § 523(a)(2). Specifically, § 523(a)(2)(A) excepts from discharge debts obtained by "false pretenses, a false representation, or actual fraud, other than a statement re-

specting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(B), on the other hand, bars the discharge of a debt obligation obtained by a false written statement "respecting the debtor's . . . financial condition." See 11 U.S.C. § 523(a)(2)(B).[7] Based on this statutory language, discharge claims based on fraudulent *written* statements concerning a debtor's financial condition must be brought pursuant to § 523(a)(2)(B), not § 523(a)(2)(A). In addition:

> These two subsections of § 523(a) were enacted to address distinct factual situations. . . . [T]hey [also] differ with respect to the element of reliance—that is, the extent to which the creditor altered its position because of the debtor's misrepresentations. Whereas subsection (2)(A) requires the creditor to prove "justifiable reliance," subsection (2)(B) mandates the more demanding showing of "reasonable reliance."

*Colombo Bank v. Sharp (In re Sharp)*, No. 08–1646, 340 Fed.Appx. 899, 2009 U.S.App. LEXIS 18200 (4th Cir. Aug. 14, 2009) (citing *Field*, 516 U.S. at 66, 116 S.Ct. 437).

In the Opinion and Order Regarding Dischargeability, the bankruptcy court found that Douglas had established each of the elements for nondischargeability under § 523(a)(2)(B). Furthermore, although it granted the Motion to Amend, it concluded that, because Douglas had established all of the elements of his § 523(a)(2)(B) claim, it did not need to address the merits of the

§ 523(a)(2)(A) count. We will discuss each of these rulings below.

## II. Section 523(a)(2)(B)

In order to establish that a debt is nondischargeable under § 523(a)(2)(B), a creditor must prove five elements: (1) the debtor made a statement in writing; (2) the statement concerned the debtor's or an insider's financial condition; (3) the statement was materially false; (4) the creditor actually and reasonably relied on this false statement; and (5) the debtor made the false statement with the intent to deceive the creditor. *See* 11 U.S.C. § 523(a)(2)(B). If the creditor fails "to establish any one of the elements by a preponderance of the evidence, then the court should reject his claim." *Palmacci*, 121 F.3d at 787. We conclude that the bankruptcy court incorrectly determined that: (1) the Projection was a statement of financial condition for purposes of § 523(a)(2)(B); and (2) Douglas' reliance on the Projection was reasonable.

### A. Was the Projection a statement of "financial condition"?

To except a debt from discharge under § 523(a)(2)(B), the creditor must prove that the debtor made a written statement "respecting the debtor's or an insider's financial condition." This statutory phrase is not defined in the Bankruptcy Code and courts have disagreed over whether to interpret the phrase broadly to include any statement that has a bearing on the financial position of the debtor or

---

7. Section 523(a)(2)(B) provides as follows:
 (a) discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
 (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
 (B) use of a statement in writing—
 (i) that is materially false;
 (ii) respecting the debtor's or an insider's financial condition;
 (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
 (iv) that the debtor caused to be made or published with intent to deceive.
 11 U.S.C. § 523(a)(2)(B).

an insider,[8] or narrowly so as to include only statements providing information as to a debtor's net worth, overall financial health, or an equation of assets and liabilities.[9] *See Schneiderman v. Bogdanovich (In re Bogdanovich)*, 292 F.3d 104, 112 (2d Cir.2002) (discussing the different approaches).[10] Nevertheless, all courts agree that in determining whether a statement relates to a debtor's financial condition, the term is not limited to formal financing statements. *See id.* We refrain from adopting a specific approach here because the result would be the same regardless of the approach taken.

The bankruptcy court concluded that the Projection was intended to show that Boston Waves had the capacity to generate income to repay Douglas' investment, and that "although not a statement of net worth, per se, the Projection was a statement of financial condition." The bankruptcy court went on to state that "under either a narrow or broad construction of 'financial condition,' Kosinski's written representations in the Projection that Boston Waves would have more than sufficient income to repay Douglas' investment and that it had no outstanding loans to jeopardize its profits were statements of financial condition."

 We disagree with the bankruptcy court's conclusion that the Projection constituted a statement of financial condition. Although a statement of financial condition does not need to be a formal

---

**8.** *See, e.g., Engler v. Van Steinburg (In re Van Steinburg)*, 744 F.2d 1060 (4th Cir.1984) ("A debtor's assertion that he owns property free and clear of other liens is a statement respecting his financial condition."); *see also Tompkins & McMaster v. Whitenack (In re Whitenack)*, 235 B.R. 819, 825–26 (Bankr.D.S.C. 1998); *Beneficial Nat'l Bank v. Priestley (In re Priestley)*, 201 B.R. 875, 882 (Bankr.D.Del. 1996); *Hudson Valley Water Res., Inc. v. Boice (In re Boice)*, 149 B.R. 40 (Bankr.S.D.N.Y. 1992).

**9.** *See, e.g., Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 714 (10th Cir.2005) (engaging in detailed analysis); *Land Inv. Club, Inc. v. Lauer (In re Lauer)*, 371 F.3d 406, 413–14 (8th Cir.2004); *see also Prim Capital Corp. v. May (In re May)*, 368 B.R. 85, 2007 WL 2052185, *6, 2007 Bankr.LEXIS 2335, *16 (6th Cir. BAP 2007); *Skull Valley Bank of Goshute Indians v. Chivers (In re Chivers)*, 275 B.R. 606, 615 (Bankr.D.Utah 2002); *Weiss v. Alicea (In re Alicea)*, 230 B.R. 492, 504 (Bankr. S.D.N.Y.1999); *Old Kent Bank–Chicago v. Price (In re Price)*, 123 B.R. 42, 45 (Bankr. N.D.Ill.1991).

**10.** The First Circuit has not specifically adopted either approach, and courts within the circuit have applied different interpretations. *See, e.g., Middlesex Sav. Bank v. Flaherty (In re Flaherty)*, 335 B.R. 481, 489 (Bankr. D.Mass.2005) (noting that to fall under § 523(a)(2)(B), the financial statement must be "one that specifically states a debtor's or insider's net worth"); *Northeast Credit Union v. Butterworth (In re Butterworth)*, 279 B.R. 31, 33 (Bankr.D.N.H.2002) (concluding that written request for increase in credit card limit which listed some but not all of debtor's financial obligations was not financial statement for § 523(a)(2)(B) purposes); *Norcross v. Ransford (In re Ransford)*, 202 B.R. 1 (Bankr.D.Mass.1996) (adopting the results-oriented "modified expansive view"); *Zimmerman v. Soderlund (In re Soderlund)*, 197 B.R. 742, 746 (Bankr.D.Mass.1996) (adopting restrictive meaning); *Benjelloun v. Robbins (In re Robbins)*, 178 B.R. 299, 304 (Bankr. D.Mass.1995) (holding that statement regarding value and net worth of single piece of property was not a statement respecting financial condition); *Bal–Ross Grocers, Inc. v. Sansoucy (In re Sansoucy)*, 136 B.R. 20, 23 (Bankr.D.N.H.1992) (adopting narrow view, stating "a 'statement of a debtor's or insider's financial condition' as used in § 523(a)(2)(A) and (B) means a balance sheet and/or profit and loss statement or other accounting of an entity's overall financial health and not a mere statement as to a single asset or liability"); *Connecticut Nat'l Bank v. Panaia (In re Panaia)*, 61 B.R. 959, 960 (Bankr.D.Mass. 1986) ("The phrase 'respecting the debtor's ... financial condition' is to be broadly interpreted.").

financing statement, it must, in some way, describe the financial condition of the debtor. *See In re Flaherty*, 335 B.R. at 489 (noting that financial statement need not "be a formal document produced by commercial or banking institutions", but "[n]evertheless, it must describe the financial condition of the debtor"). The normal commercial meaning and usage of "statement" in connection with "financial condition" denote either a representation of an entity's overall net worth or an entity's overall ability to generate income. *See In re Sansoucy*, 136 B.R. at 23; *Jokay Co. v. Mercado (In re Mercado)*, 144 B.R. 879, 883 (Bankr.C.D.Cal.1992); *see also In re Joelson*, 427 F.3d at 714 ("False statements [for purposes of § 523(a)] are those that purport to present a picture of the debtor's overall financial health," including "those analogous to balance sheets, income statements, statements of changes in overall financial position, or income and debt statements that present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities. . . . What is important is not the formality of the statement, but the information contained within it-information as to the debtor's or insider's overall net worth or overall income flow."). This necessarily means that there must be some historical perspective to the figures contained within the statement, and it follows that a statement that provides unsubstantiated projections of future performance does not constitute a statement of financial condition for purposes of § 523(a)(2). Here, the Projection does not provide an overall view of Boston Waves' financial health. It does not provide an accounting of assets and liabilities or otherwise show Boston Waves' net worth. In fact, it does not present any information relating to Boston Waves' existing or historical financial condition despite the fact that the business operated during at least part of the previous twelve-month period. Rather, the Projection provides a twelve-month projection of *possible* expenses and sales, mere projections for the future business operations. As such, we conclude that it is not a statement of financial condition for purposes of § 523(a)(2)(B).

## B. Did Douglas "reasonably rely" on the Projection?

In determining whether a creditor "reasonably relied" on a false written statement, the court must first determine that the creditor actually relied on the false statement, and then, that the reliance was objectively reasonable. *In re Flaherty*, 335 B.R. at 490–91 (citing *Lease Corp. of Amer. v. Harloff (In re Harloff)*, 272 B.R. 496, 500 (Bankr.M.D.Fla.2001)). In reviewing the bankruptcy court's conclusions on this issue, the Panel applies a *de novo* review to the question of whether the bankruptcy court correctly applied the reasonable reliance standard and a clear error standard to the finding that the reliance was reasonable. We conclude that the bankruptcy court erred in finding that Douglas' reliance on the Projection was reasonable for purposes of § 523(a)(2)(B).

### 1. Actual reliance

The bankruptcy court concluded that the testimony at trial indicated that Douglas relied upon the Projection and that he would not have made the $75,000 loan to Pavilion Realty Trust had he not received it. A review of the record indicates that there were sound reasons for the bankruptcy court's finding. Douglas presented unrebutted evidence that he reviewed the figures in the Projection and relied upon them when he extended the loan. In addition, Douglas was not required to show that he relied on every item in the Projection. Rather, it was enough to show that Douglas took the

statement *as a whole* into account and gave it weight. *See Shawmut Bank, N.A. v. Goodrich (In re Goodrich)*, 999 F.2d 22, 25 (1st Cir.1993) ("... [I]t is enough if the misstatement or omission is a 'substantial factor' in the decision to make or renew a loan."); *Coughlin v. First Nat'l Bank of Boston (In re Coughlin)*, 27 B.R. 632, 637 (1st Cir. BAP 1983) ("All that is required is that the financial statement was a 'contributory cause of the extension of credit.'"). The issue, therefore, is whether Douglas' reliance was reasonable.

### 2. Reasonable reliance

Section 523(a)(2)(B) requires the creditor to prove that it reasonably, as opposed to justifiably, relied on the written statement at issue. To determine reasonable reliance under § 523(a)(2)(B), we look to the circumstances surrounding the transaction. *In re Menna*, 16 F.3d at 11. The indicia of reasonableness include:

> (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*In re Flaherty*, 335 B.R. at 491 (citing *In re Harloff*, 272 B.R. at 500); *see also In re Menna*, 16 F.3d at 11 (citing with approval *BancBoston Mort. Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1560 (6th Cir. 1992), which lists same indicia of "reasonableness" as *In re Flaherty* ).[11] This test has been applied by a number of courts with only slight variation. *See, e.g., First Nat'l Bank of Olathe, Kan. v. Pontow*, 111 F.3d 604 (8th Cir.1997) (looking at totality of circumstances court-applied test); *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir.1993) (same); *Guess v. Keim (In re Keim)*, 236 B.R. 400, 402–403 (8th Cir. BAP 1999) (same).[12]

In this case, the bankruptcy court examined many of these factors and concluded that, under the circumstances of this case, Douglas' reliance on the Projection was reasonable. With respect to the first two elements, the bankruptcy court recognized that Kosinski and Douglas did not have a personal relationship or prior business dealings. It did, however, find that Kosinski held a position of trust and elevated stature for Douglas given his position as the teacher at each of the seminars and investment group meetings and his success in the real estate investment field. The bankruptcy court did not address the third element.

With respect to the fourth element, whether there were red flags that would have alerted an ordinarily prudent investor, the bankruptcy court found that Ko-

11. In *In re Menna*, the First Circuit applied a reasonable reliance standard to a case that arose under § 523(a)(2)(A). The Supreme Court has since determined that for purposes of that subsection, the reliance need only be proved under the lesser standard of justifiable reliance. *Field*, 516 U.S. 59, 116 S.Ct. 437 (explaining justifiable reliance standard depends upon the qualities and characteristics of the plaintiff and the more demanding reasonable reliance standard requires an analysis of a community standard of conduct).

12. One court added another element: the amount of money involved. *Malone & Hyde, Inc. v. Eckert (In re Eckert)*, 221 B.R. 40, 45 (Bankr.S.D.Fla.1998) ("The more money there is at stake, the more investigation is required.").

sinski's reassurances caused Douglas to overlook any red flags. With respect to the fifth element, whether even minimal investigation would have revealed inaccuracies, the bankruptcy court found that although Douglas failed to investigate further, this was due to Kosinski's well-honed predatory skills.

On appeal, Kosinski argues that the bankruptcy court erred with respect to the first two elements because he and Douglas did not have a close personal relationship and only knew each other from various seminars and groups. Also, he and Douglas did not have any prior business dealings and, although Kosinski hosted networking and investment groups, Douglas was well educated and knew that Kosinski had no experience operating a nightclub. Kosinski also argues that the court erred because there were many red flags that Douglas pointed out himself, such as the fact that Boston Waves had no operating history, the nightclub was a seasonal business, and Kosinski had no experience running a nightclub. According to Kosinski, a minimal investigation would have revealed the inaccuracy of the Projection, but Douglas failed to do any due diligence whatsoever.

Clearly, the bankruptcy court gave little weight to whether there existed red flags or whether a minimal amount of investigation would have exposed errors in the Projection. Reported cases, in contrast, rely heavily on these factors. *See, e.g., First Midwest Bank v. Beeler (In re Beeler)*, No. 08–4006, 2009 WL 363907, *10 (Bankr. D.S.D. Feb.10, 2009). Instead, the bankruptcy court excused these factors due to the relationship between the parties

(teacher/student), the naivete of the creditor (newly in the field of real estate investing), and facts related to Kosinski's investment schemes (luring students to invest in his projects). In taking this approach, the bankruptcy court appears to have recognized the "reasonable" standard but applied the "justifiable" standard.[13] That is, the bankruptcy court looked at whether Douglas himself was justified in overlooking the red flags (not whether there were red flags objectively), and whether Douglas felt cowed by Kosinski (rather than whether minimal investigation would have revealed errors). *See Field*, 516 U.S. at 71, 116 S.Ct. 437 (stating that the standard to which the person is held when justifiable reliance is the applicable test is simply a subjective one, not an objective one; it is "a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."). The reasonable reliance assessment required by § 523(a)(2)(B) imposes a more demanding standard than that applicable to the issue of justifiable reliance. We conclude that Douglas failed to meet this standard.

From an objective standpoint, there were several red flags that Douglas chose to overlook.[14] One such red flag was the fact that the Projection showed a projected revenue of over a million dollars despite the fact that the enterprise was newly formed, was a seasonal business and had struggled during its first year. In addition, the figures on the Projection were developed from historic figures from a prior nightclub, one that had failed several

---

**13.** This is further highlighted by the fact that the bankruptcy court wrote extensively about Kosinski's investing background and schemes.

**14.** One court defined a red flag to be information that was "either internally inconsistent or

inconsistent with other information provided to the Plaintiff by the Debtor." *Park v. Chan (In re Chan)*, No. 06–0062, 2008 WL 5428271 *20 (Bankr.E.D.Pa. Dec.31, 2008).

years before, rather than on Boston Waves' operating history, and yet Douglas did not question the projected figures. Another red flag was the fact that the Projection had a line entry for loans up at the top (not in the section related to expenses) and the entries were blank even though Kosinski had told Douglas that he and Florek had invested a million dollars into the project. Moreover, Kosinski had no experience in running a nightclub and there is no indication that Douglas had anyone with experience in the entertainment or restaurant industry examine the Projection as to whether the figures regarding the prospective profits were reasonable.[15] As a result, there were clear warning signs that a reasonably prudent investor would not have ignored.

Moreover, it appears that minimal investigation would have revealed the inaccuracies in the Projection. An objectively reasonable person considering whether to invest in a nightclub operation would have asked to see the actual figures from the preceding years, and inquired of Nabhan about the accuracy of the figures both historically and prospectively. A reasonable person would have asked for documentation regarding the figures Kosinski used, and would have asked about the empty loan entries on the Projection. A reasonable person would have inquired about the status of the liquor license where the license had been a problem during the first season of operation and where there was an entry on the Projection that said "Licenses" and reflected a prospective payment of $4,000 in April, 2004. A minimal investigation into the figures contained in the Projection would have revealed their inaccuracies. Douglas failed to do *any* such investigation and, therefore, was not ordinarily prudent.

His reliance on the statements and representations contained in the Projection, without some independent verification, was not reasonable. As a result, the bankruptcy court erred in concluding that the debt was nondischargeable under § 523(a)(2)(B).

### III. Section 523(a)(2)(A)

As noted above, although Douglas did not specify subsections (a)(2)(A) or (a)(2)(B) in his original complaint, he amended his complaint to argue both subsections in the alternative. Before we consider Douglas' § 523(a)(2)(A) claim, we must determine whether the bankruptcy court erred in allowing the Motion to Amend.

### A. Motion to Amend

 Bankruptcy Rule 7015(b), applying Rule 15(b) to adversary proceedings, provides:

> Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party

---

**15.** For example, an analyst from the industry may question why the Projection reflects reve-nue from the restaurant but has no expenses for comestibles.

fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Fed. R. Bankr.P. 7015(b). Under Rule 7015(b), motions to amend a complaint to conform to the evidence admitted at trial are liberally allowed. *Noonan v. Rauh (In re Rauh),* 119 F.3d 46, 52 (1st Cir.1997). Generally, such motions are granted "so long as the opposing party has not been prejudiced in presenting his case." *Brandon v. Holt,* 469 U.S. 464, 471 n. 19, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985); *see also* In re *Rauh,* 119 F.3d at 52. Prejudice in this context refers to whether the opposing party had fair notice that the claims at issue were being pursued, and an opportunity to defend against them, or whether the opposing party consented, expressly or by implication, to trial of those issues. *In re Byers,* 304 B.R. at 7.

■■■■ Bankruptcy Rule 7015(b) and Rule 15(b) apply under two distinct circumstances: "when an issue not contained in the pleadings is tried by consent (express or implied) of the parties, or when a party objects to evidence as outside the pleadings and the court exercises its discretionary right to allow amendment." *Invest Almaz v. Temple–Inland Forest Products Corp.,* 243 F.3d 57, 71 n. 19 (1st Cir.2001). This case presents a question of trial by consent. As the First Circuit has explained:

> Consent to trial on a particular claim can be either express or implied.... "Consent to the trial of an issue may be implied if, during the trial, a party acquiesces in the introduction of evidence which is relevant only to that issue." *DCPB, Inc. v. City of Lebanon,* 957 F.2d 913, 917 (1st Cir.1992). But "the intro-

duction of evidence directly relevant to a pleaded issue cannot be the basis for a founded claim that the opposing party should have realized that a new issue was infiltrating the case." *Id.; see Galindo v. Stoody Co.,* 793 F.2d 1502, 1513 (9th Cir.1986) ("It is not enough that an issue may be 'inferentially suggested by incidental evidence in the record;' the record must indicate that the parties understood that the evidence was aimed at an unpleaded issue.").

*Kenda Corp. v. Pot O'Gold Money Leagues, Inc.,* 329 F.3d 216, 232 (1st Cir. 2003). A Rule 15(b) motion may be denied for a number of reasons, most notably "undue delay" in making the motion and "undue prejudice" to the opposing party. *Invest Almaz,* 243 F.3d at 71.

■■ On appeal, Kosinski does not argue that he was prejudiced by the bankruptcy court's allowance of the amendment, but rather that, because Douglas did not specifically set forth a § 523(a)(2)(A) count before the bar date, any amendment would be improper. Douglas' original complaint was ambiguous in that it mentioned § 523(a)(2) but did not specify either subsection (A) or (B). As such, Kosinski was on notice that Douglas could be pursuing a claim against him under either subsection. In addition, the complaint itself set forth a possible cause of action under § 523(a)(2)(A), stating allegations that Kosinski's intentional misrepresentations constituted "actual fraud," a term that is found in subsection (a)(2)(A) but not (a)(2)(B). Moreover, the record demonstrates that Kosinski did not object at trial to the presentation of evidence regarding his oral statements and/or misrepresentations to Douglas. Given this record, Kosinski implicitly consented to evidence supporting a § 523(a)(2)(A) claim. This is not a case where Kosinski was confronted with a claim entirely different from the claims

raised in the original pleadings and was deprived of a fair opportunity to challenge the evidence presented. Thus, there is nothing in the record to suggest that the bankruptcy court's allowance of the Motion to Amend was an abuse of discretion.

### B. The bankruptcy court's conclusions under § 523(a)(2)(A)

 Section 523(a)(2)(A) excepts from discharge "any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud...." 11 U.S.C. § 523(a)(2)(A). To establish that a debt is nondischargeable under this section, a creditor must show that: (1) the debtor made a knowingly false representation or one made in reckless disregard of the truth; (2) the debtor intended to deceive; (3) the debtor intended to induce the creditor to rely upon the false statement; (4) the creditor actually relied upon the misrepresentation; (5) the creditor's reliance was justifiable; and (6) the reliance upon the false statement caused damage. *In re Spigel*, 260 F.3d at 32 (citing *Palmacci*, 121 F.3d at 786). Thus, to invoke § 523(a)(2)(A), the creditor must also show that he "actually and justifiably relied" on the false statement or statements. *Palmacci*, 121 F.3d at 786.

The bankruptcy court held that because Douglas had established all of the elements of his nondischargeability claim under § 523(a)(2)(B), it did not need to address the § 523(a)(2)(A) count. As a result, the bankruptcy court made no factual findings or legal conclusions regarding whether the debt could be excepted from discharge under subsection (a)(2)(A). Because the bankruptcy court did not assay the merits of the § 523(a)(2)(A) count, we remand to the bankruptcy court for proceedings consistent with this opinion.

### IV. Liability

 Kosinski argues that the bankruptcy court erred in finding that Kosinski was personally liable for the obligations of the Pavilion Realty Trust and Boston Waves because as the *trustee* of a Massachusetts nominee trust, he could not be held personally liable for any of the trust's contractual obligations. We conclude that the bankruptcy court correctly ruled that, under Massachusetts law applicable to nominee trusts and piercing the corporate veil, Kosinski cannot escape personal liability for a nondischargeable debt based on his status as trustee and/or beneficiary of the Pavilion Realty Trust. As the Opinion adequately elucidates the controlling facts and relevant legal authority on this issue, we adopt the Opinion on this issue as no useful purpose would be served by reasserting the analysis here.

### *CONCLUSION*

Based on the foregoing, we conclude that the bankruptcy court erred in concluding that the debt owed to Douglas was nondischargeable under § 523(a)(2)(B), and we **REVERSE** that holding. We **AFFIRM** the bankruptcy court's allowance of Douglas' Motion to Amend. However, we **REMAND** the bankruptcy court's holding regarding the § 523(a)(2)(A) count for findings and conclusions on the merits.