**Alfio J. RAGONESE, Debtor.**

**Richard Falcone and Mary Falcone,**
**Plaintiffs–Appellees,**

v.

**Alfio J. Ragonese, Defendant–**
**Appellant.**

**BAP No. MW 13–036.**
**Bankruptcy No. 11–42867–MSH.**
**Adversary No. 11–04138–MSH.**

United States Bankruptcy Appellate Panel of the First Circuit.

Feb. 26, 2014.

Robert H. Bowen, Esq., on brief, Lunenburg, MA, for Defendant–Appellant.

N. Jeanette Robinson, Esq., and James P. Harrington, Esq., on brief, for Plaintiffs–Appellees.

Before KORNREICH, TESTER, and FINKLE, United States Bankruptcy Appellate Panel Judges.

TESTER, Bankruptcy Judge.

The debtor, Alfio J. Ragonese, appeals from a bankruptcy court judgment excepting a portion of the claim of Richard and Mary Falcone (collectively the "Falcones") from discharge, pursuant to § 523(a)(2)(A).[1] For the reasons set forth below, we **AFFIRM** the judgment.

### BACKGROUND

The facts are undisputed.[2] At all times relevant, the Falcones resided in Texas and owned vacation property in Wakefield, New Hampshire. In January 2007, Mrs. Falcone, using a pseudonym, posted an internet solicitation for bids to construct a home on the property. Mr. Ragonese, a Massachusetts resident doing business as RACO Construction Corp. or RACO Development Corp. (collectively "RACO"), responded to the solicitation. In the spring of 2007, after a number of discussions, the Falcones hired him for the project. In March and June 2007, the Falcones paid RACO a total of $60,000.00 to demolish the existing house on their New Hampshire property and to prepare the site for construction. They also supplied Mr. Ragonese with a set of architectural plans for their new home prepared by the Reitmann Design Group.

On June 15, 2007, Mr. Ragonese presented the Falcones with a document on RACO letterhead which appeared to be a contract for the project (the "June 2007 construction summary"). The June 2007 construction summary was "amateurishly drafted," with numerous typographical errors. *In re Ragonese*, 2013 WL 3379537, at *1. For example, the document contained the following window description:

> All windows will be Harvey Windows. I am sure you have recognized their name on TV a [sic] one of the largest manufacturers of windows and exterior doors. Their product is clearly high quality as I have always used them and have never had any complaints or problems.

*Id.* The June 2007 construction summary called for the demolition of the existing structure on the property, site work, and construction of the new home according to the Reitmann plans for $615,000.00. Mr. Falcone signed the document, after making certain handwritten changes, including the addition of items totaling $20,000.00 and the deletion of the requirement that change orders be in writing. Neither the original nor amended construction summary were signed by Mrs. Falcone, Mr. Ragonese, or RACO. Despite the absence of a signed contract, the Falcones paid RACO $100,000.00 on July 26, 2007.

"The project did not proceed smoothly." *Id.* at *2. Initially, the town building inspector refused to issue a building permit because the architectural plans were deficient. This resulted in the hiring of a structural engineer to revise the Reitmann plans. The resulting changes to the project increased construction costs. Because

---

**1.** Unless otherwise indicated, the terms "Bankruptcy Code," "section" and "§ " refer to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended.

**2.** We rely on and adopt the bankruptcy court's detailed findings set forth in its memo-

randum of decision, as the parties have not made the trial transcript a part of the record. *See Falcone v. Ragonese (In re Ragonese)*, Adv. P. No. 11–4138, 2013 WL 3379537 (Bankr. D.Mass. July 8, 2013).

the parties did not memorialize the changes in a signed writing, there was confusion regarding the changes and who would bear their cost. As fall approached, "there was little visible progress at the building site." *Id.*

In September 2007, Mr. Ragonese requested additional money to continue construction. Mr. Falcone responded, "I've already paid you $160,000[.00]," which "elicited a lecture by Mr. Ragonese on the intricacies of house building in New Hampshire." *Id.* Mr. Falcone told Mr. Ragonese that the house needed to be framed and made weather-tight and the septic system installed prior to the onset of winter. Mr. Ragonese responded that he needed money in order to do this. On September 6, 2007, the Falcones paid RACO another $100,000.00.

On September 23, 2007, Mr. Ragonese called Mr. Falcone, who was in Texas, and requested a $75,000.00 payment to continue work on the house. Mr. Falcone complied on September 25, 2007. Construction of the house continued through October.

On November 2, 2007, Mr. Ragonese called Mr. Falcone, requesting another $100,000.00 payment. The house was not yet weather-tight. On November 9, 2007, the Falcones paid RACO another $100,000.00, bringing the total payments to $435,000.00. However, up to this time, there had never been a formal construction progress schedule, written or verbal, for the Falcones' project.

In mid-November, Mr. Ragonese again requested more money. Mr. Falcone, concerned about the lack of progress on the job, for the first time asked Ragonese for a construction schedule. "On November 18, 2007, Mr. Ragonese emailed to Mr. Falcone an 'estimated' construction schedule for the period from November 19 through December 10, 2007." *Id.* at *2. The sched-

ule included exterior work on siding, septic, and underground utilities and interior work on rough electrical, HVAC, and rough plumbing. "In the email, Mr. Ragonese stated that starting November 19, 2007, 'I will be exclusively on this project.' He also asked Mr. Falcone for $125,000.00 plus $55,000.00 for certain extras that Mr. Falcone had requested." *Id.*

Also in mid-November, the Falcones received a written demand from Ossipee Aggregate Corp., one of RACO's subcontractors or suppliers, for payment of $31,000.00 for goods or services supplied to their project. Mr. Falcone expressed to Mr. Ragonese his concern that RACO and Mr. Ragonese were not devoting the Falcones' payments exclusively to their project and his fear that Ossipee Aggregate Corp. would place a lien on their property.

In a lengthy email to Mr. Falcone dated November 24, 2007, Mr. Ragonese attempted to justify the project delays. He again asked for more money and stated "all your monies are going on your project." *Id.* at *3. In a subsequent email dated November 27, 2007, Gina Ragonese, Mr. Ragonese's wife and RACO's bookkeeper, assured the Falcones: "[Y]our house will NOT HAVE ANY LIENS ON IT." *Id.* (internal quotations omitted).

On November 30, 2007, the Falcones paid RACO another $100,000.00, bringing the total payments to $535,000.00. On December 19, 2007, Mr. Ragonese sent the Falcones an email updating them on the status of the project and again asking for more money. According to the email, siding, HVAC, interior electric, and plumbing remained incomplete.

On January 4, 2008, Mr. Falcone paid RACO $28,000.00 for certain extras requested by the Falcones. The evidence was unclear whether this amount incorporated the $20,000.00 added by Mr. Falcone

to the June 2007 construction summary or was in addition to that sum. There was no dispute, however, that the payment was for extra work not contemplated in the original draft of the June 2007 construction summary.

On January 26, 2008, the Ragoneses and Falcones toured the construction project together and discussed the remaining work. Mr. Ragonese sent the Falcones an email a few days later which contained a two-page summary dated January 22, 2008, outlining 18 extra items that Mr. Ragonese claimed were not within the project's scope as described in the June 2007 construction summary. Mr. Ragonese estimated that the additional cost would be $99,700.00.

At the end of January 2008, Mr. Falcone informed Mr. Ragonese that progress on the project was inadequate, and that he would make no further payments until the project was further along. Mr. Ragonese disagreed, and told the Falcones that he would not continue the project without additional payment.

"The parties were at loggerheads." *Id.* The project halted. Mr. Ragonese and RACO never worked on it again. The parties dispute whether the work was 50 percent or 75 percent complete at this time. "In either case, a considerable amount of work was needed to finish the project." *Id.* The Falcones ultimately hired another builder to complete construction of their home, at an additional cost of more than $390,000.00.

In June 2011, Mr. Ragonese filed a voluntary petition for chapter 7 relief in the United States Bankruptcy Court for the District of Massachusetts. Thereafter, the Falcones commenced an adversary proceeding against Mr. Ragonese with a three-count complaint under § 523(a)(2)(A) and § 523(a)(4), seeking to except their claim from discharge. They also sought a declaratory judgment under a veil-piercing theory that the debts of RACO to the Falcones should be deemed the debts of Mr. Ragonese, personally. The Falcones alleged that they hired Mr. Ragonese, through his company, RACO, based on Mr. Ragonese's representations regarding his expertise as a builder and stone mason and the amount of time he would spend on-site to supervise the construction. They further alleged that when Mr. Ragonese made these representations, he knew they were false and intended for the Falcones to rely upon them. The Falcones claimed that they justifiably relied on Mr. Ragonese's misrepresentations when they entered into a contract with him for an original price of $615,000.00. They asserted that between March 2007 and January 2008, they made payments totaling $563,000.00 to Mr. Ragonese and RACO pursuant to the contract and requests by Ragonese. They further asserted that Mr. Ragonese and RACO abandoned the construction project when it was less than 50 percent complete, and some of the construction payments tendered to Mr. Ragonese were used for other purposes.

The Falcones sought a determination in Count I of their complaint that Mr. Ragonese's indebtedness to them (in an unspecified amount) was nondischargeable pursuant to § 523(a)(2)(A). In Count II, they asserted that the debt was nondischargeable pursuant to § 523(a)(4). In Count III, they attempted to pierce the corporate veil of RACO in order to hold Mr. Ragonese liable for RACO's indebtedness to them.

Mr. Ragonese denied the Falcones' allegations. The court conducted a trial on the merits in January 2013. At that time, the Falcones withdrew Counts II and III, leaving only their claim for nondischargeability under § 523(a)(2)(A). At trial, they asserted, without any objection by Mr. Ra-

gonese, that Mr. Ragonese would become personally liable to them if they could prove he fraudulently induced them to pay money to RACO.

In July 2013, the court entered judgment in favor of the Falcones in the amount of $100,000.00, representing the amount of their November 30, 2007 payment. In its accompanying memorandum of decision, the court indicated that it was treating the Falcones' "claim for fraudulent inducement in all respects as if it had been raised in the pleadings." [3]

The court then found that there was no fraud in connection with the first $435,000.00 of payments. This included the first two payments totaling $60,000.00 in the spring of 2007; the third payment of $100,000.00 in July 2007; the $100,000.00 payment in early September 2007; the $75,000.00 payment in late September 2007; and the $100,000.00 payment in early November 2007. The court reasoned:

> The evidence establishes that the Falcones wanted their house framed and made weather tight by winter and Mr. Ragonese told them RACO needed these payments to achieve their objective. While it is true that Mr. Ragonese fell short of achieving their goal, the evidence at trial does not establish that he acted fraudulently or made false or recklessly or deceptively untruthful statements up to this time. At best the evidence establishes that Mr. Ragonese was involved in multiple construction or development projects during the relevant time period and he failed to devote sufficient attention to the Falcone[s'] project. The evidence is also clear that

Mr. Ragonese caused RACO to commingle in a single bank account the payments from the Falcones with all the other incoming payments on its projects thereby resulting in payments to RACO's subcontractors and suppliers from commingled funds. Mr. Ragonese also failed to delineate with precision the scope of the Falcone[s'] project, especially the various changes and additions that arose during the course of construction. In short, Mr. Ragonese and RACO were sloppy and unprofessional. Why the Falcones were willing to fork over hundreds of thousands of dollars to RACO on this basis is a mystery.

*Id.* at *5. The court also found that the final payment of $28,000.00 made in January 2008 was free of fraudulent inducement, as it was "specifically earmarked by the Falcones for extra work and materials requested by them for which they felt responsible." *Id.* at *7.

The November 30, 2007 payment was different. The court found that this payment was fraudulently induced, explaining:

> In a November 24, 2007 email Mr. Ragonese told the Falcones that "all your monies are going into the project." In a November 27, 2007 email Mrs. Ragonese assured them that the house "will NOT HAVE ANY LIENS ON IT." In a November 18, 2007 email Mr. Ragonese presented the Falcones with a three week construction schedule in which he promised to "be exclusively on this project." I find that it was based on these commitments that the Falcones paid RACO the additional $100,000 on November 30, 2007.

---

**3.** In so doing, the court relied upon the absence of any opposition from Mr. Ragonese as well as the following provision of the Restatement of Torts (Second):

> One who makes a fraudulent misrepresentation is subject to liability to the persons

> ... whom he intends or has reason to expect to act or to refrain from acting in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance ...

See *In re Ragonese,* 2013 WL 3379537, at *4.

I find that Mr. Ragonese fraudulently induced the Falcones to pay RACO $100,000 on November 30th. The evidence at trial establishes that all the Falcones' payments to RACO were deposited into a Citizens Bank checking account of RACO which account was used to pay expenses of RACO including expenses unrelated to the Falcones' project. Prior to November 24, 2007, any expectations the Falcones harbored that their payments were being kept separate by Mr. Ragonese for use only on their project were unreasonable. There is no evidence of an agreement to this effect. However, in his November 24, 2007, email Mr. Ragonese did agree to devote all money paid by the Falcones to their project. I find that Mr. Ragonese's representation was untrue and he knew it to be untrue when he made it. As was the case with all their other payments, Mr. Ragonese commingled the Falcones' November 30, 2007, payment of $100,000 with other funds in RACO's checking account. Mrs. Ragonese testified that she paid the bills for a number of projects from RACO's checking account and that she reviewed all invoices with Mr. Ragonese prior to payment.

Mr. Ragonese also falsely represented to the Falcones in his email of November 18, 2007, that as of November 19, 2007, he would work exclusively on their project. Dana Johnson, a carpenter who worked on the Falcones' project between September 2007 and January 2008, testified that Mr. Ragonese was not at the project on a daily basis and that he would see Mr. Ragonese a couple of time[s] per week. I find that Mr. Ragonese knew that his promise to be exclusively on the Falcone[s'] project was false at the time he made it.

By his false statements Mr. Ragonese intended to induce the Falcones, who by mid-November 2007 were threatening to freeze payments, to make the additional $100,000 payment of November 30th. That the Falcones relied on Mr. Ragonese's promises is fully consistent with the testimony of Mr. Falcone, which I find credible and compelling.

*Id.* at *6.

The court found that the Falcones' reliance was justifiable under the circumstances, reasoning as follows:

Using all their senses, including their ability to observe, their common sense and the accumulated understanding of their relationship with Mr. Ragonese, the Falcones could not have uncovered the falsity of Mr. Ragonese's representations that he would devote all his time and all their money to the project. The Falcones['] reliance being justified for purposes of their non-dischargeability claim, it is also justified for purposes of their tortious misrepresentation claim.

*Id.* at *7.

Based on the foregoing, the court ruled that the November 30, 2007 payment of $100,000.00 was a liability which was excluded from Mr. Ragonese's discharge pursuant to § 523(a)(2)(A). This appeal followed.

## POSITIONS OF THE PARTIES

Mr. Ragonese lists a single issue in his Statement of Issues, namely, whether the Falcones' reliance on his misrepresentations was justifiable. Mr. Ragonese strenuously argues that it was not, based upon the Falcones' knowledge of certain facts, including the incompleteness of the project, Mr. Ragonese's history of absence from the project, and the threatened subcontractor's lien. Although Mr. Ragonese argues cursorily in his brief that the bankruptcy court erred in finding that his misrepresentations caused the Falcones' loss,

he excluded this issue from his Statement of Issues. During oral argument, Mr. Ragonese admitted that he had not raised the causation issue below and that he included it in his brief on appeal essentially as an afterthought. We therefore deem the causation issue waived. *See City Sanitation, LLC v. Burdick (In re Am. Cartage, Inc.)*, 438 B.R. 1, 9–10 (D.Mass.2010) (holding that where issue raised for first time on appeal was not "encompassed" or "inferred" by any "listed issue," it is waived).

The Falcones argue that their reliance on Mr. Ragonese's false promises was justifiable given the totality of the circumstances, including their eight-month relationship with Mr. Ragonese, their pressing need to make their New Hampshire home weather-tight as winter approached, and the challenge inherent in monitoring their construction project from Texas. They claim that they did not turn a blind eye when they received a subcontractor's claim for payment.

### *JURISDICTION*

■ A bankruptcy appellate panel is " 'duty-bound' " to determine its jurisdiction before proceeding to the merits, even if not raised by the litigants. *Boylan v. George E. Bumpus, Jr. Constr. Co. (In re George E. Bumpus. Jr. Constr. Co.)*, 226 B.R. 724, 725–26 (1st Cir. BAP 1998) (quoting *Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.)*, 218 B.R. 643, 645 (1st Cir. BAP 1998)). A panel may hear appeals from "final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1); *see also In re Bank of New England Corp.*, 218 B.R. at 645. We have previously ruled that an order denying dischargeability is a final, reviewable order once the damage amount is determined. *See Douglas v. Kosinski (In re Kosinski)*, 424 B.R. 599, 606–607 (1st Cir. BAP 2010) (citation omitted); *see also*

*Cambio v. Mattera (In re Cambio)*, 353 B.R. 30, 31 n. 1 (1st Cir. BAP 2004) ("We have jurisdiction to review a bankruptcy court's final judgment regarding the nondischargeability of a debtor's obligations") (citations omitted). Thus, we have jurisdiction.

### *STANDARD OF REVIEW*

■ "The Panel generally reviews findings of fact for clear error and conclusions of law *de novo.*" *In re Kosinski*, 424 B.R. at 607 (citations omitted). "The definition of the standard of justifiability is a purely legal issue, reviewable *de novo....*" *Lentz v. Spadoni (In re Spadoni)*, 316 F.3d 56, 58 (1st Cir.2003). "[A] divided panel of [the First Circuit] held that the same standard governs application of the justifiability standard to particular facts—a law application or 'mixed' question." *Id.* (citing *Sanford Inst. for Sav. v. Gallo*, 156 F.3d 71, 74 (1st Cir.1998)).

### *DISCUSSION*

**I. Nondischargeability Under § 523(a)(2)(A)**

■ Section 523(a)(2)(A) excepts from discharge debts obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). Because exceptions to discharge are narrowly construed in favor of the debtor in an effort to further the "fresh start" policy underlying the Bankruptcy Code, the creditor asserting an exception to discharge must show that its claim comes " 'squarely' " within an exception enumerated in § 523(a). *Sharfarz v. Goguen (In re Goguen)*, 691 F.3d 62, 68 (1st Cir.2012) (quoting *McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir.2001)).

In order to establish that a debt is nondischargeable under § 523(a)(2)(A), a creditor must show that:

> (1) the debtor made a knowingly false representation or one made in reckless disregard of the truth; (2) the debtor intended to deceive; (3) the debtor intended to induce the creditor to rely upon the false statement; (4) the creditor actually relied upon the misrepresentation; (5) the creditor's reliance was justifiable; and (6) the reliance upon the false statement caused damage.

*In re Kosinski,* 424 B.R. at 615 (citing *In re Spigel,* 260 F.3d at 32; *Palmacci v. Umpierrez,* 121 F.3d 781, 786 (1st Cir. 1997)). The standard of proof for each element of a § 523 claim is by a preponderance of the evidence. *Palmacci,* 121 F.3d at 787 (citing *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). If the creditor fails to establish any one of the six elements, then the court must reject its claim. *Id.*

Only the fifth element, justifiable reliance, is at issue here.[4] In *Field v. Mans,* 516 U.S. 59, 66, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), the Supreme Court addressed the level of "justification a creditor needs to show above mere reliance in fact in order to exempt the debt from discharge under § 523(a)(2)(A)." Noting § 523's silence on this issue, the Court turned to the Restatement (Second) of Torts (1976):

> The Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." ... Here a contrast between a justifiable and reasonable reliance is clear: "Al-

though the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." ... Justifiability is not without some limits, however. As a comment to § 541 [of the Restatement (Second) of Torts] explains, a person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."

*Field v. Mans,* 516 U.S. at 70, 116 S.Ct. 437 (citations omitted); *see also Gallo,* 156 F.3d at 74–75 ("A party may justifiably rely on a misrepresentation even when he could have ascertained its falsity by conducting an investigation.") (citations omitted).

"The rationale for placing this relatively low burden on the victim of the misrepresentation is rooted in the common law rule that the victim's contributory negligence is not a defense to an intentional tort." *Gallo,* 156 F.3d at 74 (citations omitted). "In such circumstances, the equities weigh in favor of giving the benefit of the doubt to the victim, careless as it may have been, and even though it could have been more diligent and conducted an investigation." *Id.*

Applying the *Field* standard, the First Circuit in *Spadoni, supra,* concluded that a landlord's reliance on his tenant's misrepresentations that he would pay rent was

---

4. Because the bankruptcy court decision did not include an examination of the sixth element, causation, and Mr. Ragonese has waived that issue, as stated previously, this Panel will not address it; nor do we examine any of the other elements because Mr. Ragonese did not address them in the proceedings below or on appeal.

justifiable, even though the landlord's trust had been tested by the tenant's repeated but unfulfilled promises of payment. 316 F.3d at 59. The First Circuit accorded significance to the parties' friendship, and cautioned courts to temper the "natural tendency ... to insist on reasonable—man prudence from the creditor...." *Id.* at 60. Accordingly, in *Aoki v. Atto Corp. (In re Aoki),* 323 B.R. 803, 816 (1st Cir. BAP 2005), we ruled that the creditor justifiably relied on the debtor's misrepresentations concerning the medicinal efficacy of a certain extract, in light of the parties' shared Japanese heritage.

## II. The Justifiable Reliance Standard Applied

 The record reveals that as the winter of 2008 approached, the Falcones found themselves in the unenviable position of having to manage from Texas a construction project in New Hampshire and scurrying to make their home weather-tight. At this juncture, they had already invested a considerable sum in the project, and were therefore understandably desperate to secure their home against the winter elements. Moreover, the record does not disclose any patent falsity with respect to Mr. Ragonese's promises that he would remain exclusively on the Falcones' job site and would apply the Falcones' payments solely to their project. Consistent with the rule expressed in *Field,* the Falcones had no duty to investigate the truth of Mr. Ragonese's promises, absent a clear manifestation of their falsity. Applying the Supreme Court's creditor-friendly test to the particular circumstances of this case, we see no obvious reason why the Falcones' trust, even if tested by the slow progress of construction and Mr. Ragonese's increasing appetite for payment, "could not rationally endure" in November of 2007 when they paid Mr. Ragonese $100,000.00

in the hope that the house would be protected against the onset of winter. *See In re Spadoni,* 316 F.3d at 59. Thus, we agree with the bankruptcy court's determination that the Falcones justifiably relied on Mr. Ragonese's assurances that he would remain exclusively on the project and devote all of their payments to it.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the bankruptcy court.