Per Curiam.
*419 Homeowners, Sheila DeWitt and Joseph DeWitt (collectively, the "DeWitts"), appeal from the bankruptcy court's Memorandum Opinion and Final Judgment (collectively, the "Judgment") determining that the obligation allegedly owed to them by their builder, Edward T. Stewart, Jr. ("Stewart"), is dischargeable in bankruptcy.[2] The DeWitts contend that the bankruptcy court should have excepted Stewart's alleged obligation from discharge pursuant to § 523(a)(2)(A) and § 523(a)(6).[3] The record establishes that the DeWitts satisfied their burden of proving: (1) all of the necessary elements for a claim of nondischargeability under § 523(a)(2)(A); and (2) that Stewart should be personally liable for the debt owed to them by Boardwalk by piercing Boardwalk's corporate veil under New Hampshire law. Accordingly, we REVERSE the Judgment as to § 523(a)(2)(A) and REMAND to the bankruptcy court for further proceedings consistent with this opinion.[4]
BACKGROUND
I. Introduction
Stewart is the owner of Data Industries, Inc., which did business as Boardwalk North ("Boardwalk"), a company specializing in home remodeling. In June 2013, the DeWitts entered into a contract with Boardwalk, whereby Boardwalk agreed to renovate the DeWitts' New Hampshire home for $1,649,936.[5] The contract included a three-page payment schedule based on the "start of" certain construction milestones.[6] At the commencement of each of these specified milestones, the contract required the DeWitts to pay to Boardwalk the sum of $41,931.81. The contract did not explicitly state, however, how the milestone payments were to be disbursed or allocated.
Pursuant to a change order executed on August 2, 2013 (the "Change Order"), the contract amount was reduced to $1,300,000. One year later, when the project was only 45% complete, and after the DeWitts had paid Boardwalk a total of $1,175,350, Boardwalk abandoned the project. In September 2014, Boardwalk filed a petition for chapter 7 relief. Stewart's own chapter 7 bankruptcy petition followed several months later. The DeWitts have since paid a new contractor an additional $730,000 to complete the project, far more than the remaining contract balance of $175,755. The DeWitts filed a proof of claim in Stewart's case, indicating that they held an unsecured claim in the amount of $558,335.28.
II. Bankruptcy Proceedings
A. The Amended Complaint
On May 26, 2015, the DeWitts commenced an adversary proceeding against *420 Stewart with a thirteen-count complaint which they subsequently amended (the "Amended Complaint").[7] In the Amended Complaint, the DeWitts alleged that Stewart, the sole shareholder, president, and treasurer of Boardwalk, operated that company as his "alter ego ... to perpetrate injustice and fraud upon" them. The DeWitts further alleged that Stewart "made numerous false representations to induce [them] into a contract with" Boardwalk, "misappropriated [their] advance payments and deposits ..., paid his personal expenses with those funds, and utilized Boardwalk['s] bank account as his own personal checking account." Accordingly, they claimed the "fiction" that Boardwalk was independent of Stewart "should be disregarded" and Stewart "should be held personally liable for Boardwalk['s] breaches of contract, breaches of the covenant of good faith and fair dealing, negligence, conversion, fraudulent misrepresentations, and violations of [N.H. Rev. Stat. Ann. §] 358-A" (New Hampshire's Consumer Protection Act). They also sought a determination that Stewart was not entitled to a discharge in bankruptcy pursuant to § 727 or, alternatively, that Stewart's debt to them was not dischargeable pursuant to § 523.
In support of these claims, the DeWitts further alleged, in pertinent part:
(1) "In or about April 2013, [Stewart] met with the DeWitts concerning the renovation and addition to their home. [Stewart] personally represented that he had the skill, experience, and manpower to deliver a first-class Project by July 2014. [Stewart] personally represented that he had strong relationships with subcontractors and materials suppliers."
(2) "The DeWitts hired Boardwalk .... The Contract was modified pursuant to an August 2, 2013 agreed change order ... reducing the total contract amount to $1,300,000."
(3) "At the time of signing the Contract, [Stewart] requested, and the DeWitts paid, a $200,000 down payment."
(4) "Unbeknownst to the DeWitts, [Stewart] immediately began to misappropriate the DeWitts' deposit."
(5) "On or about August 29, 2013, Boardwalk [ ] began work on the Project. [Stewart] required the DeWitts to make 'up front' installment payments tied to various "milestones." [Stewart] personally represented to the DeWitts that paying in advance for work would allow him to negotiate the best possible prices with subcontractors and would save the DeWitts substantial sums of money. In reliance on [Stewart's] representations, the DeWitts made such installment payments, never refusing to pay for a milestone once work had been started. [Stewart's] representations, however[,] were false."
(6) "[Stewart] also proposed that the DeWitts could receive up to $20,000 in prepaid milestone 'discounts' in exchange for an additional $172,000 up-front deposit, which the DeWitts made. This deposit was in addition to the $200,000 deposit the DeWitts initially paid. The Contract required that Boardwalk ... would pay all subcontractors and material suppliers for labor and materials used on the Project, and would hold the DeWitts' funds in trust for use on their Project. Instead, [Stewart] used *421 the DeWitts' deposits and advance milestone payments to pay debts unrelated to the Project, including the [Stewart's] personal obligations and expenses."
(7) "On July 18, 2014, one of Boardwalk['s] subcontractors, Manning Drywall, sent the DeWitts a notice of intent to file a mechanic's lien against the Project."
(8) "On July 22, 2014, the DeWitts met with [Stewart]. At that meeting, [Stewart] stated that [he] was in the process of 'recapitalizing the company' but gave no indication that the Project would not be completed."
(9) "Manning Drywall filed a lien against the Project ...."
(10) "On or about July 24, 2014, [Stewart] notified the DeWitts by email that any financial difficulties had been resolved, and reiterated that Boardwalk intended to return to the Project to complete the work [ ]."
(11) "[T]his representation that financial difficulties had been resolved was false ...."
(12) "The last day any person from Boardwalk [ ] was onsite performing substantive construction work was August 11, 2014. [Stewart] refused to return to the Project to complete construction and abandoned the Project."
Based on the foregoing allegations, the DeWitts asserted seven counts under state law, four § 523(a) counts, and two § 727(a) counts. See note 4, supra. After substantial winnowing of the issues, the bankruptcy court tried only two counts of the Amended Complaint-Count VIII, the § 523(a)(2)(A) claim, and Count XI, the § 523(a)(6) claim.[8]
B. The Trial
A summary of each witness's testimony on direct examination follows in the same order it was presented at trial.
1. Sheila DeWitt
Sheila DeWitt ("Mrs. DeWitt"), a scientist with a Ph.D. in chemistry, testified regarding a variety of topics, ranging from the seeds of the parties' relationship to the numerous ways in which the DeWitts claim Stewart misrepresented his ability, *422 Boardwalk's financial condition, and the purpose of the DeWitts' payments. She began by explaining that when she and her husband, Joseph DeWitt ("Mr. DeWitt"), moved to New Hampshire in 2000, they purchased a house suitable for their community "outreach," including serving meals to homeless individuals. Because the DeWitts' expanding community work eventually demanded more space, they embarked upon a home renovation project in 2013.
The DeWitts set a renovation budget of $700,000 to $1,000,000 and searched for a contractor. In March 2013, they met Stewart at a New Hampshire home show, where he had set up a booth for Boardwalk. During their first conversation with Stewart, the DeWitts described their renovation project as "large scale," and Stewart responded that he was "well qualified" for such an undertaking.
The DeWitts subsequently began a "[due] diligence process," which included sending emails to potential contractors containing a set of questions drafted by Mrs. DeWitt. On March 23, 2013, Stewart received one of Mrs. DeWitt's "vetting" emails, which included the following inquiries: (1) "What were your annual revenues and number of jobs for 2011 and 2012 (separated by year)?"; and (2) "What are your revenue projections for 2013 (without [the] DeWitt project)?"
On March 24, 2013, Stewart responded that for the year 2011, Boardwalk's revenues were $2,300,000. For the same period, however, Stewart's financial records for Boardwalk later disclosed during the course of discovery showed revenue of $1,948,000, and Boardwalk's tax return indicated revenue of $1,946,000. For the year 2012, Stewart reported to Mrs. DeWitt that Boardwalk had revenues of $1,700,000. Yet, Boardwalk's 2012 tax return for that year later revealed income of $1,500,000. Stewart further disclosed to Mrs. DeWitt that Boardwalk's income for the first quarter of 2013 was $1,200,000, while Stewart's financial records for that period showed income of approximately $335,000. Moreover, Stewart "indicated that his company was doing extremely well," that "[h]e had a large and experienced team, [and] a long and healthy track record of success in building high-end homes," and that the DeWitts "should have trust and confidence in him and his team." In addition, Stewart represented that he had "excellent relationships" with subcontractors.[9] Mrs. DeWitt testified that, had the DeWitts known Boardwalk's actual revenues, they would have selected a different contractor.
Mrs. DeWitt's testimony then shifted to the documents which memorialized the parties' agreements. The first was a "design fee purchase agree[ment]" (the "Design Agreement") executed by the parties on April 19, 2013, pursuant to which Stewart (on behalf of Boardwalk) agreed to furnish a design proposal to the DeWitts at a cost of $2,895. The Design Agreement indicated an anticipated price range of $700,000 to $1,000,000 for completion of the project, and called for a "Good Faith Deposit" of "approximately 10-15% of the estimated [s]elling price of project." Appended to the agreement was a document captioned "DeWitt Design Parameters," which similarly indicated a price range of $700,000 to $1,000,000.
On June 26, 2013, the DeWitts paid Stewart "a good faith deposit" of $200,000 (the "first deposit"). This deposit significantly exceeded the amount called for in *423 the Design Agreement. The DeWitts voluntarily increased the amount of the required deposit "in a good faith effort to continue a relationship with Boardwalk ...." They were eager "to start out on the right foot" and believed that the first deposit would be applied to their project.
The DeWitts saw the "final contract" for the first time on June 27, 2013-the day after they paid the $200,000 deposit. On that date, Stewart presented them with a Purchase Agreement which recited a project price of $1,649,936.[10] Mrs. DeWitt explained that they were "shock[ed]" by this figure. With respect to payment, the Purchase Agreement provided: "Payments to be made as the work progresses as per the Payment Schedule which is attached and made part of this Contract." The Payment Schedule listed 12 "milestones," each linked to a $41,932 payment. Mrs. DeWitt testified that, when she and her husband saw the Purchase Agreement, they wanted "to walk away," but "felt trapped." They went forward despite their hesitations.
During the course of the next six weeks, the DeWitts and Stewart's team met on several occasions in order to "come up with alternative proposals." On August 2, 2013, the parties executed the Change Order, which reduced the price of the project to $1,300,000. Like the Purchase Agreement, the Change Order linked the payment schedule with the "start of milestones." Stewart explained to the DeWitts that the purpose of the "milestone payment" approach was to "leverage subcontractors, vendors and other resources that he needed ... so that he could move [the project] forward in a timely fashion."
On August 27, 2013, at Stewart's request, the DeWitts made a second "good faith deposit" in the amount of $172,000 (the "second deposit") and the parties executed another payment schedule. Mrs. DeWitt testified that Stewart said this second deposit would increase "efficiency on [the] project and ensure it was done." With respect to this deposit, her attorney inquired:
Q. [W]here did you understand that money was going to be spent?
A. On our project.
Q. He told you that?
A. Yes.
Q. And did you have any reason initially to believe that that was not true?
A. No, not at all.
Notations on the August 27, 2013 Payment Schedule indicated that two of the progress payments (both paid on August 27, 2013) had been reduced from $40,619 to $38,588, reflecting a discount for prepayment.
As of August 27, 2013, work on the project had not yet begun, although the DeWitts had already paid Stewart about $450,000-consisting of the first deposit of $200,000, the second deposit of $172,000, and two prepaid milestone payments of $38,588 each. Work on the project site did not commence until two days later. Mrs. DeWitt testified that, according to Stewart, the prepayment of the milestones would enable him to hire subcontractors at a discount which he would "pass ... on" to the DeWitts.
When her attorney again asked, "What were you told was going to happen with your money?" Mrs. DeWitt answered:
A. We were told the money would be used for our project.
Q. To fund your project?
A. To fund our project.
*424 Q. Would you have given this amount of money in advance to any contractor if you knew it was going to pay old bills?
A. Never.
Q. Did you rely on Mr. Stewart's statement that you were, in fact, funding your own project?
A. We did.
Q. Did you rely on that in terms of agreeing to this payment schedule?
A. We did.
A. Did you rely on that statement in terms of following the payment schedule?
A. Yes.
Mrs. DeWitt further testified that she later learned Stewart had actually spent a portion of the $450,000 they paid-namely, $196,000-on jobs other than theirs. She repeated that she "never" would have paid the $450,000 if she had known Stewart was not using this sum to fund their own project. However, the DeWitts continued to make the prepayments upon request, believing that Stewart was applying the money exclusively to their project. For example, after the commencement of the project, on September 26, 2013, the DeWitts made two additional milestone payments totaling $77,176. Mrs. DeWitt stated that they continued "to funnel money into Boardwalk" because they "felt trapped and wanted to ... get the project done." They subsequently learned, however, that Stewart used $51,000 out of the $77,176 paid "on other expenses of Boardwalk." Throughout her direct examination, Mrs. DeWitt consistently testified that she and her husband had been told their payments were "going to [their] project" and that they would not have continued to pay money to Boardwalk if they had known that the payments "were actually being used to pay old bills."
Although the DeWitts prepaid every milestone days or even weeks in advance, there were still project delays. Mrs. DeWitt testified that when they inquired about the cause for the delays, they were told Boardwalk "couldn't get the ... subcontractors for the job." After Stewart had remained out of sight for eight months, he and Brian Lessard, a Boardwalk employee, finally met with the DeWitts and informed them that Boardwalk needed up to $360,000 to finish the project, even though the remaining balance due on their account at that time should have been $175,000.
Mrs. DeWitt then testified to a number of events which reflected Boardwalk's deteriorating financial condition. For example, on July 18, 2014, one of Boardwalk's subcontractors, Manning Drywall, sent the DeWitts a notice of intent to file a mechanics lien against the project. By then, the DeWitts had paid over $1,000,000 and their home was in shambles. On or about July 23, 2014, Manning Drywall filed a mechanics lien and two other subcontractors, Concord Lumber and Wetherbee Plumbing and Heating, soon followed suit.
On July 24, 2014, Stewart notified the DeWitts that Boardwalk had "resolved" its financial difficulties and work on the project would resume. On July 30, 2014, the parties had a final meeting, during which Stewart asked the DeWitts if they would "consider a mutual termination" of their agreement. The DeWitts declined. On August 15, 2014, Boardwalk abandoned the project and, shortly thereafter, Stewart sent the DeWitts an "As Built Policy Invoice," indicating that the DeWitts owed an additional $183,629, even though they had "already paid in advance" for work that had not been performed.
These developments prompted the DeWitts to hire a new contractor, Hutter Construction ("Hutter"), who completed the project for $598,450.
*425 2. Brian Lessard
Brian Lessard testified that he was employed by Boardwalk from 2006 through 2014-first, as its lead carpenter, then as its field site supervisor, and as its production manager. He ultimately became its vice president of operations. In 2013, when work on the DeWitts' project began, Lessard served as Boardwalk's vice president of operations, in charge of quality control. When questioned about Boardwalk's financial health as of April 2013, Lessard answered that the company was "struggling" and that it "had a deficit." He described some of Boardwalk's relationships with subcontractors as "strained" or even "bad." According to Lessard, Boardwalk had been charging some of its expenses to the personal credit card of Stewart's wife, Linda ("Mrs. Stewart").
Consistent with Mrs. DeWitt's testimony, Lessard testified that he informed Boardwalk's clients that milestone payments enabled them to "finance" or "fund" their own projects. Lessard conceded that, in fact, milestone payments were collected to fund Boardwalk's business and improve its cash flow.
In addition, Lessard testified regarding an email he sent to the DeWitts in which he used the word, "leverage." Specifically, on March 4, 2014, Lessard wrote:
As far as the pre-payment goes, as you [can] imagine in order for us to offer this discount the idea is that we are leveraging your money to save money. So we would need to leverage your money for more th[a]n a couple days to [offset] the ($20,000.00 [overall] ) discount being applied. This program was designed with the intention that there would be multiple payments made at a time and that would allow us plenty of time to leverage and save money, with time being the catch. Having the benefit of your funds for a mere few days in return for such a large amount of money would be ill advised by even the most liberal accounts ... which is what he [Ed] believes the spirit of that agreement was all about, he said.[11 ]
Lessard admitted that even though he told the DeWitts their payments were being "leveraged" with subcontractors to save money, this actually never occurred. According to Lessard, Stewart instructed him to "find ways to start the milestones," even if not in the DeWitts' "best interests," in order to "keep the business moving forward" and "keep the company alive." In fact, even though the DeWitts had consistently prepaid the milestone payments, Boardwalk still had difficulty obtaining timely delivery of materials to the DeWitts' site. Lessard admitted that when the DeWitts inquired about the resulting project delays, he never informed them that Boardwalk's financial condition was "the root of the problem."
Lessard testified that he regretted Boardwalk's treatment of the DeWitts, stating:
A. "I'm not proud of the conduct of myself or the guys -- things were asked of the guys in the field to do or say."
Q. ... "Give me an example." ...
A. "Being elusive or deceitful."
Q. ..."In what sense were you or your guys or other Boardwalk ... employees elusive and deceitful?" ...
A. ...[We were] blowing a lot of smoke and clouds [ ]"
Q. ..."To cover up the company's own financial problems" ... ?
A. "Yeah."[12 ]
*426 Despite all of the foregoing difficulties, Lessard testified, he had believed that Boardwalk would nonetheless finish the DeWitts' project.
3. Linda Stewart
Mrs. Stewart testified that she had worked for her husband in an administrative capacity since 1998. According to Mrs. Stewart, from 2009 to 2012, neither she nor her husband took a salary from Boardwalk. In May 2013, shortly after receiving a chapter 7 discharge in her personal bankruptcy case, Mrs. Stewart started receiving a $1,500 weekly salary from Boardwalk, which soon increased to $2,000.
Mrs. Stewart testified that in 2008, she and her husband obtained a $450,000 line of credit secured by their New Hampshire residence and applied a portion of the loan proceeds to Boardwalk's obligations and the remaining proceeds toward the purchase of a second home in Florida.
4. Lars Traffie
Lars Traffie, president and CEO of Hutter, testified as an expert in the fields of residential construction, construction management, construction sequencing, construction billing, and construction industry standards. Traffie testified that the standard billing practice in the construction industry is to "bill on a monthly basis based on the percentage completed and ... installed." According to Traffie, unlike Boardwalk, Hutter did not bill in advance for work not yet performed, unless a particular project required special fabrication of an item.
Traffie testified that based on his initial site visit in August 2014, he estimated the DeWitt project to be 45% complete. Upon his inspection, he discovered the structural integrity of the house was "challenged," certain tasks were not sequenced properly, the master bedroom plumbing was not properly connected to the septic system, doors and windows had been installed without sealant, flashing was missing, and the roof had to be torn off. He stated that "the sequencing was so inexplicable" that one could conclude it was "motivated by payment schedules." He quoted the DeWitts a price of $628,000 to finish the project.
5. Peter Pike
Peter Pike ("Pike"), a certified public accountant, testified that since 2010 or 2011, when he began working with Boardwalk, the company was always on the "fringe of insolvency." He further testified that in February 2013 (only two months before Stewart met the DeWitts), Boardwalk was "starting to come unraveled" and the situation was "dire." At that time, Boardwalk had sustained net operating losses for several consecutive years. In February 2014, Pike met with Stewart to discuss cash flow issues and a possible bankruptcy filing.[13]
6. Edward T. Stewart, Jr.
During his testimony, Stewart acknowledged that: he had never informed the DeWitts that Boardwalk was struggling; the Purchase Agreement was the largest contract he had ever signed; and he had given Mrs. DeWitt incorrect revenue figures for Boardwalk. Stewart agreed with Pike's testimony that Boardwalk "had perpetual cash flow issues." In an effort to explain the discrepancy between the "numbers" he gave Mrs. DeWitt and Boardwalk's true financial condition, he testified:
At the time, I was answering with my sales hat on, if you will, and salespeople *427 always think in terms of not revenue but in terms of sales.... So my answer was based [not] on revenue ... but sales.
Although Stewart admitted that when Boardwalk contracted with the DeWitts, a number of its subcontractors had already stopped extending credit to Boardwalk, he nonetheless insisted that he had good relationships with vendors and subcontractors. He claimed that he was "flabbergasted" when he received the notice of mechanics lien from Manning Drywall.
A significant portion of Stewart's examination at trial was aimed at eliciting from him what he meant by "funding" one's project. Stewart agreed that he had informed the DeWitts their milestone payments were intended "to fund their own project." On direct examination by his own attorney, Stewart testified that he used the milestone payment approach as a "way to fund the project as you went through it." He stated: "We always explain to the customer that these milestones were never intended to be completion points in time but rather the start of things. And again, they were just approximate times that we would ask for money throughout the project. "
Stewart admitted that he used the DeWitts' monies to operate Boardwalk but denied that he had told the DeWitts their milestone payments would be applied exclusively to their project. "I've never told any client that," he insisted. He explained that when he received milestone payments from customers, he "just deposited them into the general company account."
Stewart's testimony about the purpose of the second deposit was inconsistent. First, he disagreed that the $172,000 payment had anything to do with the DeWitts' eligibility for prepayment discounts, characterizing it, instead, as a "good faith deposit part 2." He later conceded, however, that the second deposit was the price of obtaining a 5% discount on milestone payments.
Lastly, Stewart testified that, in August 2014 (i.e., the same month he abandoned the project), he borrowed $50,000 from his 401(k) retirement account to apply toward Boardwalk's obligations.
7. Joseph DeWitt
Mr. DeWitt testified that if he had known the truth about Boardwalk's financial condition, "[Boardwalk] would have dropped out of the running." Mr. DeWitt reiterated that Stewart described his business as "booming," and that he had the ability to "get any subcontractors that he wanted." He also testified that Stewart assured him that he could complete the project within the DeWitts' budget of $700,000 to $1,000,000, but that it would "be closer to a million." Later, according to Mr. DeWitt, Stewart confessed to him that the project never could have been finished for $1,000,000.
Mr. DeWitt described his meeting with Stewart on June 27, 2013-the day after the DeWitts paid Boardwalk $200,000 by wire transfer. During that meeting, Stewart revealed the price of $1,649,000 and Mr. DeWitt was "stunned." When the DeWitts asked why the price was so high, Stewart blamed it on the DeWitts' add-ons. Yet, according to Mr. DeWitt, the parties had gone through a "process of take things out, take things out ...." When the DeWitts did add something, and asked about the cost of the change, Stewart would say: "Joe, you can't tell until you get to the end of the project."
Mr. DeWitt testified that toward the end of July 2013, when the DeWitts met with Stewart, they announced they were "done" and stated that they wanted their "money back." Stewart, in turn, asked: "What will it take to save this project and what's the most you'll spend on this." This resulted in *428 a revised budget of $1,300,000. According to Mr. DeWitt, Stewart responded: "We can do a house for that amount of money but we have to sign right now ...."
Mr. DeWitt also testified that the second deposit was "money to secure the prepaid discount." He explained his understanding of the milestone payment schedule as follows:
A. The milestone schedule [ ] was set up [so] that we would pay money to [Stewart] in advance so he could use that money to leverage to get contractors to get any subsidy needed to get the equipment on site .... [Stewart] explained it so that he didn't have to have a big inventory of stuff and we didn't have to have delays to get stuff. He could have stuff just in time.
Q. [ ] Did he tell you what was going to happen with your money?
A. He was going to use it to fund our project. He was going to leverage that ... to get people to do the work.
C. Memorandum Opinion
The bankruptcy court began the analysis set forth in its 44-page Memorandum Opinion by "assum[ing], without deciding, that [Boardwalk's] corporate veil has been pierced." DeWitt v. Stewart (In re Stewart), Adv. Pro. No. 15-1032-JMD, 2017 WL 3601196, at *9 (Bankr. D.N.H. Aug. 18, 2017). The court reasoned:
Both the New Hampshire veil-piercing standard and the elements [of] § 523(a)(2)(A) and (a)(6) ... involve fraud and injustice generally. Under the specific facts of this case, the Court believes that it would be difficult to find the elements of the § 523(a) claims satisfied but not the elements of the veil-piercing standard. This assumption allows the Court to cut straight to the heart of the dispute between the parties-if Stewart's debts to the DeWitts are dischargeable, including those that would be imputed to him via veil-piercing-whether the corporate veil should actually be pierced is beside the point. Accordingly ... the Court shall refer to either the actions of [Boardwalk] or Stewart interchangeably.
Id. (footnote omitted).
1. Section 523(a)(2)(A)
The bankruptcy court concluded that "any liability Stewart owes to the DeWitts should not be excepted from discharge pursuant to § 523(a)(2)(A)." Id. at *20. In support, the bankruptcy court made extensive findings of fact, including the following:
(1) The DeWitts "failed to present sufficient evidence for the Court to find that Stewart intended to deceive [them] with his statements in [the March 24, 2013] email[ ]." Id. at *11.
(2) "The revenue numbers themselves do not support an inference of an intent to deceive. These numbers provided were approximations, as Stewart indicates in his answer to M[r]s. DeWitt's first question." Id.
(3) "[T]he revenue figures Stewart provided are [not] different enough from the gross taxable income amounts for them not to be reasonable approximations." Id.
(4) "[T]here is no evidence that Stewart was specifically aware of the revenue numbers as stated in the 2011 tax returns, or in his company's QuickBooks records. The 2012 and 2013 tax returns are dated seven and twelve months after the March 24, 2013 email. These returns do not establish that Stewart had knowledge of their contents in March 2013." Id.
(5) "The evidence is insufficient to demonstrate that Stewart was trying to *429 deceive the DeWitts by offering [the projected revenue number for 2013] .... Stewart's explanation that he had his 'sales hat' on when answering the revenue questions and came up with the numbers by thinking of 'pipeline' sales is plausible ...." Id.
(6) "The DeWitts have presented insufficient evidence for the Court to conclude that they actually relied on the revenue emails in making their decision to form a business relationship with [Boardwalk]." Id. at *12.
(7) "[T]he DeWitts essentially disregarded their own due diligence efforts ...." Id.
(8) "[I]t [is] incredible that the DeWitts were not aware that their project was a significant undertaking for [Boardwalk]. The DeWitts presented no evidence that [Boardwalk] or Stewart attempted to hide the size and scope of their business ...." Id. at *12 n.47.
(9) "[T]he facts the DeWitts argue are material nondisclosures [ (including Boardwalk's "bad financial condition" and "relationships with subcontractors") ] were peripheral background to the transaction, at best. Despite their arguments, the DeWitts did not ask the type of questions that would have caused the general financial condition of [Boardwalk] to become a central feature of the transaction." Id. at *12.
(10) "The Court has already found that Stewart's statements in the March 24, 2013 email about [Boardwalk's] revenue did not constitute statements regarding [Boardwalk's] general financial condition. See DeWitt v. Stewart (In re Stewart), 2016 BNH 010, 7-9, [2017 WL 4402217]." Id.
(11) "Ms. Stewart's personal bankruptcy is [not] even arguably related to the essence of the transaction between the DeWitts and [Boardwalk.]" Id.
(12) "In the context of a sales pitch, telling a customer that relationships with subcontractors were 'excellent' when in reality the relationships were 'good' with some exceptions does not rise to the level of a fraudulent misrepresentation." Id. at *13.
(13) "There is insufficient evidence in the record for the Court to conclude that this proposition was actually false or that Stewart intended to deceive the DeWitts by using the terms 'excellent' and 'good' interchangeably." Id.
(14) "The evidence is insufficient to find that Stewart's statements about using payment proceeds to fund the project rise to the level of a fraudulent misrepresentation. The Court cannot conclude that Stewart either intended to convey false information to the DeWitts or to deceive them. The statements about using the proceeds to fund the project were too general for the Court to conclude that they were false." Id. at *14.
(15) "The Court finds that it is entirely possible that Stewart was telling the DeWitts that they needed to pay up front because [Boardwalk] did not have the capital to fund the project ...." Id.
(16) "Stewart made no representation that the proceeds of the project would be used exclusively for the DeWitt project." Id. at *15.
(17) "Stewart's statements about 'leveraging' subcontractors, either those he made personally to the DeWitts or indirectly in the various emails on the subject[,] are not sufficient to render a debt nondischargeable under § 523(a)(2)(A)." Id.
(18) "[T]here is no evidence that the DeWitts actually relied on the leveraging statements. The evidence shows that the DeWitts made the prepayments to *430 receive a discount up front. [Boardwalk] did in fact give them the discount." Id.
(19) "[T]he evidence does not support the conclusion that Stewart intended to mislead the DeWitts when he discussed leveraging subcontractors. Rather, the Court finds that Stewart was simply providing an explanation of why [Boardwalk] was offering the discount." Id.
(20) "Th[e] evidence is insufficient for the Court to conclude that Stewart either knew that [Boardwalk] would not be able to complete the project or recklessly disregarded the truth of that fact with an intent to deceive the DeWitts." Id. at *16.
(21) Stewart's transfer of $50,000 in August 2014 from his 401(k) retirement account "is not consistent with the state of mind of someone who is acting intentionally or recklessly to deceive." Id.
(22) "[W]hen Lessard testified that he thought the project would be finished until the day [Boardwalk] closed its doors, his testimony was straightforward and believable." Id.
(23) "The evidence does not support the DeWitts' overall narrative." Id. at *17.
(24) "[T]he evidence does not support a finding that Stewart made any specific representations that [Boardwalk] would use the proceeds exclusively on the project. The Purchase Agreement is silent on this subject and the payment structure is divided into equal amounts .... [T]he Court finds no basis to conclude that [Boardwalk's] use of funds was part of a fraudulent scheme." Id.
(25) "[It] does [not] appear that Stewart was using [Boardwalk] funds for any kind of self-dealing scheme." Id.
(26) "[T]he evidence supported Stewart's claim that proceeds of a home equity loan on the Florida home had been used to aid [Boardwalk]." Id. at *18.
(27) "The evidence does not support the conclusion that [Boardwalk] fraudulently sequenced the project for the purpose of forcing the DeWitts to make additional payments on the project. Rather, the evidence shows that the DeWitts consistently were willing to make substantial prepayments ... to obtain a discount." Id.
(28) "[T]he overall course of dealing is not indicative of actual fraud." Id. at *20.
(29) "The evidence is insufficient for the Court to conclude it more likely than not that Stewart devised a complex scheme to draw in the DeWitts, using their payment stream as revenue to keep his business propped up and feed his personal spending habit." Id.
2. Section 523(a)(6)
The bankruptcy court concluded that "Stewart lacked the intent required to find willfulness" under § 523(a)(6) and ruled that any liability Stewart owed to the DeWitts should not be excepted from discharge pursuant to § 523(a)(6). Id. at *21. The court reasoned that there was no evidence Stewart was "substantially certain that the DeWitt project would fail" or that he "ever became substantially certain he would cause the DeWitts injury." Id.
3. Remaining Counts
The court disposed of the remaining Counts of the Amended Complaint as follows:
As a result of this ruling and the Court's rulings on the Debtor's Motion for Summary Judgment and Motion for Judgment on Partial Findings, the DeWitts' claims against the Defendant will be dischargeable. These rulings also render the DeWitts' claims in Counts I-VII moot, as they are claims for damages against the Debtor that are dischargeable. In the context of a fully administered *431 chapter 7 case, there is no further relief that the Court may afford the DeWitts as creditors of the bankruptcy estate. Accordingly, the Court will enter a separate final judgment in favor of the Defendant on all counts.
Id. (footnotes omitted).
D. Final Judgment
In the Final Judgment which the court entered contemporaneously with the Memorandum Opinion, it ruled:
(1) For the reasons set forth in the Court's memorandum opinion of even[ ] date, judgment is entered in favor of the Defendant on Counts I-VII and Counts VIII and XI;
(2) For the reasons set forth in the August 18, 2016 opinion (Doc. No. 46) judgment is entered in favor of the Defendant on Counts IX and X;
(3) For the reasons set forth in the Court's order of February 22, 2017 (Doc. No. 75), judgment is entered in favor of the Defendant on Counts XII and XIII; [and]
(4) Each party shall bear its own fees and costs.
POSITIONS OF THE PARTIES ON APPEAL
I. DeWitts
On appeal, the DeWitts argue that Stewart engaged in all three forms of misconduct under § 523(a)(2)(A)-fraudulent misrepresentation, false pretenses, and actual fraud. They maintain that the "trial court committed plain factual errors, as well as misinterpreted or misapplied the applicable law." The DeWitts' assertions of error focus on the bankruptcy court's finding that Stewart did not misrepresent how he was going to use their funds. They contend that in order to obtain deposits and prepayments which he used to fund his business, Stewart falsely represented that their money would be used to: (1) "fund" their project; and (2) "leverage" subcontractors. They claim, further, that Stewart intended for them to rely on his misrepresentations, they actually did rely on his misrepresentations, their reliance was justifiable, and they were harmed.
Moreover, in support of their § 523(a)(2)(A) claim, the DeWitts argue that "courts routinely refuse to grant a discharge where contractors have falsely represented their intent to use a creditor's funds for the creditor's project." The DeWitts ask the Panel: (1) to reverse the bankruptcy court's decision and "find that the debt is excepted from discharge ..."; and (2) for such other relief as the Panel "determine[s] is just."
II. Stewart
Stewart argues the bankruptcy court correctly ruled that the DeWitts had not satisfied their burden under § 523(a)(2)(A). He maintains that the parties had different understandings of the words "fund" and "leverage." With respect to his use of the word "fund," Stewart contends that the bankruptcy court correctly found: (1) his statements were "too general to conclude that they were false"; and (2) his alleged "mis-sequencing" of the project did not prove that his statements regarding "funding" the project were false. Stewart also argues he did not make any misrepresentations regarding the "leveraging" of subcontractors, asserting that the bankruptcy court correctly found that the DeWitts received the promised discount in exchange for their prepayments.
JURISDICTION
A bankruptcy appellate panel is duty-bound to determine its jurisdiction before proceeding to the merits, even if not raised by the litigants.
*432 Rivera Siaca v. DCC Operating, Inc. (In re Olympic Mills Corp.), 333 B.R. 540, 546-47 (1st Cir. BAP 2005) (citation omitted). "Pursuant to 28 U.S.C. §§ 158(a) and (b), the Panel may hear appeals from 'final judgments, orders, and decrees ....' " Fleet Data Processing Corp. v. Branch (In re Bank of New Eng. Corp.), 218 B.R. 643, 645 (1st Cir. BAP 1998) ; see also Bullard v. Blue Hills Bank, --- U.S. ----, 135 S.Ct. 1686, 1692, 1695, 191 L.Ed.2d 621 (2015) (discussing the Panel's jurisdiction to hear bankruptcy appeals under 28 U.S.C. § 158(a) ). A bankruptcy court's judgment determining dischargeability is a final, reviewable order. Cambio v. Mattera (In re Cambio), 353 B.R. 30, 31 n.1 (1st Cir. BAP 2004) (citations omitted). Therefore, the Panel has jurisdiction to hear this appeal.
STANDARD OF REVIEW
The Panel reviews findings of fact for clear error and conclusions of law de novo. Douglas v. Kosinski (In re Kosinski), 424 B.R. 599, 607 (1st Cir. BAP 2010) (citations omitted). Determinations regarding elements of an action under § 523(a)(2) are findings of fact reviewed for clear error. Bellas Pavers, LLC v. Stewart (In re Stewart), BAP No. MB 12-017, 2012 WL 5189048, at *5 (1st Cir. BAP Oct. 18, 2012) (citations omitted); see also Palmacci v. Umpierrez, 121 F.3d 781, 785 (1st Cir. 1997). This standard is satisfied when, "upon whole-record-review, an inquiring court form[s] a strong, unyielding belief that a mistake has been made." United States v. Nuñez, 852 F.3d 141, 144 (1st Cir. 2017) (citation omitted) (internal quotations omitted); see also Sharfarz v. Goguen (In re Goguen), 691 F.3d 62, 69 (1st Cir. 2012) (citation omitted). While deference is accorded to the trial court's findings that depend on the credibility of witnesses:
"factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination."
Palmacci, 121 F.3d at 785 (quoting Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ).
DISCUSSION
I. The § 523(a)(2)(A) Standard Governing Exceptions to Discharge
Section 523(a)(2)(A) excepts from discharge debts obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. § 523(a)(2)(A). "Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's fresh start policy, and, for that reason, the claimant must show that his claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a)." Palmacci, 121 F.3d at 786 (citations omitted) (internal quotations omitted).
"An action under § 523(a)(2)(A) involves three distinct categories of misconduct-false pretenses, false representation, or actual fraud-albeit with elements that overlap." Privitera v. Curran (In re Curran), 554 B.R. 272, 284 (1st Cir. BAP 2016) (emphasis added) (citations omitted), aff'd, 855 F.3d 19 (1st Cir. 2017).
A. False Representation
In order to establish that a debt is nondischargeable under § 523(a)(2)(A) due to a false representation, the plaintiff must *433 show by a preponderance of the evidence that:
1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the false statement, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage.
In re Goguen, 691 F.3d at 66 (citation omitted) (internal quotations omitted). "If the creditor fails to establish any one of the six elements, then the court must reject its claim." Falcone v. Ragonese (In re Ragonese), 505 B.R. 605, 613 (1st Cir. BAP 2014) (citing Palmacci, 121 F.3d at 787 ).
"A false representation is an express misrepresentation[.]" Zacharakis v. Melo (In re Melo), 558 B.R. 521, 559 (Bankr. D. Mass. 2016) (citation omitted). "[T]he concept of misrepresentation includes a false representation as to one's intention, such as a promise to act." Palmacci, 121 F.3d at 786. As the First Circuit explained: "A representation of the maker's own intention to do ... a particular thing is fraudulent if he does not have that intention at the time he makes the representation." Id. (citations omitted) (internal quotations omitted).
"Intent to deceive presents a factual question which courts determine by considering a variety of factors, including the debtor's financial condition at the time the representations were made ...." Mangano v. Grenier (In re Grenier), Adv. Pro. No. 07-1131, 2009 WL 763352, at *9 (Bankr. D. Mass. Mar. 19, 2009) (citation omitted). "Because the intent to defraud is rarely proven by direct evidence, courts assess this element using a totality of the circumstances approach to discern the debtor's subjective intent." Whitcomb v. Smith (In re Smith), 572 B.R. 1, 16 (1st Cir. BAP 2017) (citing Desmond v. Varrasso (In re Varrasso), 37 F.3d 760, 764 (1st Cir. 1994) ). "[A] debtor's fraudulent intent can be inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor." In re Stewart, 2012 WL 5189048, at *8 ; see also Robin Singh Educ. Servs., Inc. v. McCarthy (In re McCarthy), 488 B.R. 814, 826 (1st Cir. BAP 2013) (stating fraudulent intent may be "inferred from a course of conduct") (citations omitted). "The focus [ ] should be on whether the surrounding circumstances or the debtor's actions appear so inconsistent with [his] self-serving statement of intent that the proof leads the court to disbelieve the debtor." In re Stewart, 2012 WL 5189048, at *9 (citations omitted) (internal quotations omitted).
"The element of reliance has two parts." Meads v. Ribeiro (In re Ribeiro), Adv. Pro. No. 11-1188, 2014 WL 2780027, at *10 (Bankr. D. Mass. June 19, 2014). "The party upon whom the misrepresentation is practiced must actually have relied on the false pretense o[r] false representation, and that reliance must have been justifiable (but need not have been reasonable)." Id."Reliance is justifiable if the falsity of the representation would not have been readily apparent to the person to whom it was made." Id. (citing Field v. Mans, 516 U.S. 59, 70-72, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) ). "The rationale for placing this relatively low burden on the victim of the misrepresentation is rooted in the common law rule that the victim's contributory negligence is not a defense to an intentional tort." Sanford Inst. for Sav. v. Gallo, 156 F.3d 71, 74 (1st Cir. 1998) (citations omitted). "In such circumstances, the equities weigh in favor of giving the benefit of the doubt to the victim, careless as it may have been, and even though it *434 could have been more diligent and conducted an investigation." Id.
B. False Pretenses
The requirements for false pretenses are largely the same as those for false representation, "except that [the] requirement of a false representation is replaced by a requirement of a false pretense, which is an implied misrepresentation or a false impression created by conduct of the debtor." In reCurran, 554 B.R. at 285 (citation omitted) (internal quotations omitted). "[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression." Merchs. Nat'l Bank of Winona v. Moen (In re Moen), 238 B.R. 785, 791 (8th Cir. BAP 1999).
C. Actual Fraud
"Actual fraud," the third form of misconduct specified in § 523(a)(2)(A), is not limited to fraud effected by misrepresentations on the debtor's part. Babin v. Stepanian (In re Stepanian), 545 B.R. 424, 430 (Bankr. D. Mass. 2015) (citing Sauer Inc. v. Lawson (In re Lawson), 791 F.3d 214, 220 (1st Cir. 2015) ); see also Husky Int'l Elecs., Inc. v. Ritz, --- U.S. ----, 136 S.Ct. 1581, 1590, 194 L.Ed.2d 655 (2016) (stating actual fraud encompasses fraudulent conveyance schemes as well as inducement-based fraud). "Rather, actual fraud in this statutory context includes conduct such as fraudulent interference with property rights, a tort quite distinct from the utterance of misrepresentations." In re Stepanian, 545 B.R. at 430-31 (citations omitted).
II. The § 523(a)(2)(A) Standard Applied
A. The False Representation Element: Whether Stewart Made any Express Misrepresentations
The issue at the heart of this appeal is whether the record establishes that the DeWitts demonstrated the presence of a false representation (other than a statement respecting the debtor's or an insider's financial condition)[14] by a preponderance of the evidence. On appeal, Stewart does not meaningfully challenge the DeWitts' assertions regarding the presence of the remaining § 523(a)(2)(A) elements. Our task is to examine Stewart's conduct within the framework of the legal principles set forth above. From the record before us, several categories of misrepresentations by Stewart emerge, including his representations that: (1) he could complete the DeWitts' project within their budget; (2) the DeWitts' deposits would be applied to their project; and (3) the DeWitts' milestone payments would be used to "fund" their project and "leverage" subcontractors.
1. The False Representations Regarding the Budget and the First Deposit
The record demonstrates that, from the outset, the DeWitts were clear and consistent regarding their renovation budget-$700,000 to $1,000,000. They expressed their desire to complete the renovation within this price range to Stewart during their early communications with him and the budget became a term of the Design Agreement. Stewart not only assured the DeWitts that Boardwalk could complete the renovation within their budget but, according to his own testimony, he also *435 helped the DeWitts establish that budget. The DeWitts were unaware at this time-and Stewart did not disclose-that Boardwalk was already coming "unraveled" and the situation was "dire"; nor did Stewart reveal that any of his relationships with subcontractors were strained. Instead, Stewart described his business as "booming." Persuaded in this manner that Boardwalk could not only complete their project, but do so within their budget, the parties' business relationship advanced; in April 2013, they executed the Design Agreement, which again identified the agreed-upon budget as $700,000 to $1,000,000 and included the DeWitt Design Parameters, echoing the same budget (while still failing to specify costs associated with the various line items). Pursuant to the terms of the Design Agreement, the DeWitts paid Boardwalk not only $2,895 to produce a design within budget, but also a $200,000 deposit. On June 26, 2013, the day after receiving the deposit, Stewart presented the DeWitts with a contract for the "shock[ing]" sum of $1,649,936, and then proceeded to use that deposit for purposes other than the DeWitt project. In fact, construction on the DeWitt site did not begin until a couple of months later and, by that time, the first deposit had been significantly dissipated. Based on this record, we conclude that Stewart misrepresented Boardwalk's ability to complete the DeWitts' renovation within budget and the purpose of the first deposit, in order to extract the deposit from them and to induce them to engage Boardwalk.
2. The False Representations Regarding the Second Deposit
On August 27, 2013-still prior to the commencement of any construction work-the DeWitts paid yet another deposit, this time in the amount of $172,000. The DeWitts both testified that Stewart explained that the second deposit was intended "to secure the prepaid discount." Stewart testified, alternately, that the second deposit was another "good faith deposit" and that the deposit would entitle the DeWitts to receive a 5% discount on prepaid milestone payments. Regardless of whether the second deposit is denominated as a "good faith deposit" or as consideration for a discount, one thing is clear and undisputed: Stewart did not use the entire deposit for the DeWitts' project and, much like the first deposit, the second was largely consumed by the time work on the site commenced. Given these circumstances, we conclude that the second deposit was procured through Stewart's fraudulent misrepresentations.
3. The False Representations Regarding Milestone Payments
Mrs. DeWitt repeatedly testified that Stewart informed the DeWitts their money was being applied to their own project. Stewart told her he would use their milestone payments to "leverage subcontractors," and that their monies would "fund" their project. When Mrs. DeWitt asked Stewart what was meant by "milestone payment," he answered that "it was money to go into [their] project to leverage subcontractors, vendors and other resources that he needed to do [the] project so that he could move it forward in a timely fashion."
Mrs. DeWitt's testimony was amply corroborated by other witnesses, including Mr. DeWitt, Lessard, and even Stewart. Mr. DeWitt reiterated throughout his direct examination that Stewart said he would use the DeWitts' payments to "fund" their project and "leverage" subcontractors. Mr. DeWitt recalled that Stewart told him that the milestone payments would also enable Stewart to acquire product "just in time."
*436 While Stewart denied stating that he would use the DeWitts' money exclusively on their project, he admitted that he told the DeWitts that their money would "fund" their project. Stewart also admitted that Boardwalk had experienced "cash flow issues" since 2008 and that he used the DeWitts' money to operate Boardwalk.
Lessard similarly testified: in 2013, Boardwalk was financially stressed; Boardwalk used the DeWitts' milestone payments to pay "old bills"; Stewart directed him to find ways to start milestones-even if not in the DeWitts' best interest-in order to generate milestone payments; Lessard told clients that milestone payments were intended to "leverage" subcontractors and to "fund" or "finance" their own projects; no "leveraging" of subcontractors occurred; Boardwalk was simply trying to improve its own cash flow with the DeWitts' payments; and, notwithstanding receipt of the DeWitts' milestone payments, Boardwalk was still unable to obtain certain goods and services timely, which resulted in project delays.
In addition, Traffie testified that the manner in which the project had been sequenced (or, more accurately, "mis-sequenced") suggested that certain tasks were commenced simply to generate milestone payments. For example, floor tile had been installed before HVAC work was completed, painting began before carpentry work was complete, and wallboard installed before electrical work was finished in the area of installation.
Based on the foregoing, the bankruptcy court's findings and conclusions supporting its decision that the DeWitts had not satisfied § 523(a)(2)(A)'s requirement of a fraudulent misrepresentation are irreconcilable with the evidence adduced at trial, and especially the bankruptcy court's findings that:
(1) Boardwalk's "bad financial condition" and "relationships with subcontractors" were "peripheral to the transaction, at best." In re Stewart, 2017 WL 3601196, at *12.
(2) "Under the circumstances, terms like 'excellent' and 'good' were both indicative of the general proposition that [Boardwalk] had good working relationships with most of its subcontractors. There is insufficient evidence in the record for the Court to conclude that this proposition was actually false or that Stewart intended to deceive the DeWitts by using the terms 'excellent' and 'good' interchangeably." Id. at *13.
(3) "The evidence is insufficient to find that Stewart's statements about using payment proceeds to fund the project rise to the level of a fraudulent misrepresentation. The Court cannot conclude that Stewart either intended to convey false information to the DeWitts or to deceive them. The statements about using the proceeds to fund the project were too general for the Court to conclude that they were false." Id. at *14.
(4) "Stewart made no representation that the proceeds of the project would be used exclusively for the DeWitt project." Id. at *15.
(5) "Stewart's statements about 'leveraging' subcontractors, either those he made personally to the DeWitts or indirectly in the various emails on the subject are not sufficient to render a debt nondischargeable under § 523(a)(2)(A)." Id.
(6) "As to [Boardwalk's] overall use of the proceeds of the DeWitts' payments on the project, the evidence does not support a finding that Stewart made any specific representations that [Boardwalk] would use the proceeds exclusively on the project. The Purchase Agreement is silent on this subject and the payment *437 structure is divided into equal amounts .... [T]he Court finds no basis to conclude that [Boardwalk's] use of funds was part of a fraudulent scheme." Id. at *17.
(7) "There is no dispute that a good portion of the proceeds did go into the project." Id. at *14.
(8) "[I]t is entirely possible that Stewart was telling the DeWitts that they needed to pay up front because [Boardwalk] did not have the capital to fund the project without payments made at the start of the different phases of the project. This explanation carries an entirely different meaning than if Stewart had told the DeWitts that [Boardwalk] would use the milestone payments exclusively for their project. Under the circumstances, the Court finds it more likely that Stewart was explaining that [Boardwalk] would not be able to perform the project without the milestone payment scheme." Id.
(9) "There was nothing fraudulent about Stewart proceeding under the impression that the parties had a deal and using the [first] deposit.... Stewart made no representation that the proceeds of the project would be used exclusively for the DeWitt project." Id. at *15.
(10) "[T]he evidence [is] insufficient to find that Stewart used the Design Agreement as the hook of some larger fraudulent scheme. Id. at *14.
(11) "[T]he evidence does not support the conclusion that [Boardwalk] fraudulently sequenced the project for the purpose of forcing the DeWitts to make additional payments on the project." Id. at *18.
(12) "[T]he overall course of dealing is not indicative of actual fraud. The evidence is insufficient for the Court to conclude it more likely than not that Stewart devised a complex scheme to draw in the DeWitts using their payment stream as revenue to keep his business propped up ...." Id. at *20.
The above factual findings are contrary to the testimony of the DeWitts, Lessard, Pike, Traffie, and Stewart, himself. Moreover, the record does not support the bankruptcy court's essential findings that Stewart did not make any misrepresentations about the use of the DeWitts' funds (both the deposits and the milestone payments), the status of his relationships with his subcontractors, or the condition of Boardwalk's business. Rather, the record demonstrates that the DeWitts proved it is more likely than not that Stewart explicitly misrepresented that he would use their money only on their project and/or to leverage subcontractors on their project.[15] Furthermore, it is clear from the record that, when Stewart characterized Boardwalk's business as "booming," its business was actually struggling and its relationships with a number subcontractors were strained due to nonpayment or late payment. With respect to these relationships, the question is not -as the bankruptcy court put it-whether they were "good" or "excellent," but rather, whether they were fair or poor. Stewart, himself, conceded that a number of subcontractors had already stopped extending credit to Boardwalk by the time Boardwalk contracted with the DeWitts. Lessard described Boardwalk's relationships with its subcontractors as "strained" when the DeWitt project began. And, by summer 2014, three subcontractors had obtained mechanics *438 liens against the DeWitts' project. Boardwalk's desperate financial condition, as evidenced by its poor relationships with subcontractors and the testimony of its accountant, compels the inference that Stewart requested milestone payments and deposits to procure funds for the benefit of Boardwalk, rather than for the DeWitts' project.
In finding that Stewart made no misrepresentations regarding the use of the DeWitts' payments, the bankruptcy court committed several clear errors. First, it excessively discounted the testimony of the DeWitts, seemingly in favor of Stewart's testimony that he transferred $50,000 in August 2014 from his 401(k) retirement account to Boardwalk. It does not necessarily follow from Stewart's attempt to rescue his own company, however, that he had been honest in his dealings with the DeWitts.
Second, in evaluating the collective testimony of the DeWitts, Stewart, and Lessard, the bankruptcy court appears to have ignored the plain meaning of the word, "fund," which, in its verb form, means "to allocate or provide funds for ... a project ...." Fund Definition, Dictionary.com, http://dictionary, reference.com/browse/fund (last visited September 24, 2018). It also disregarded the ordinary meaning of "deposit"-"anything given as security or in part payment." Deposit Definition, Dictionary.com, http://dictionary, reference.com/browse/fund (last visited September 24, 2018). Moreover, the cumulative testimony of the DeWitts, Stewart, and Lessard, persuades us that when Stewart told the DeWitts their payments would "fund" their project and when he requested deposits, he intended to communicate to the DeWitts that their monies would be applied solely to their project.
Third, without offering any explanation, the bankruptcy court wholly ignored the testimony of Lessard that relationships with subcontractors were strained, as well as Pike's testimony that Boardwalk's financial condition was "dire" as of February 2013, and that the company had been on the fringe of insolvency for years.
B. Alleged False Pretenses: Whether Stewart Made any Implied Misrepresentations
Even assuming, arguendo , that Stewart did not expressly represent that he was going to use the DeWitts' funds exclusively on their project, the bankruptcy court erred by ignoring the question of whether he impliedly made such a representation. Indeed, the DeWitts alleged false pretenses as a theory of liability in the Amended Complaint. It is well established that an overt representation is not required by § 523(a)(2)(A). In re Melo, 558 B.R. at 559. An implied misrepresentation of conduct intended to create a false representation constitutes a false pretense for § 523(a)(2)(A) purposes. Id.
Although the bankruptcy court acknowledged that false pretenses may be actionable under § 523(a)(2)(A), it failed to examine whether Stewart, by his conduct, was guilty of an implied misrepresentation. This is a critical omission under the circumstances of this case.
Cases considering the question of implied misrepresentation have often "turned on whether the funds were 'entrusted' for a specific purpose." Fensick v. Segala (In re Segala), 133 B.R. 261, 264 (Bankr. D. Mass. 1991) (excepting advances paid by homeowners to debtor-builder from discharge pursuant to § 523(a)(2)(A), reasoning he impliedly represented he would use those proceeds in the construction of their home). As the bankruptcy court stated in Segala:
*439 If funds are deemed to have been entrusted to the debtor for a specific purpose, the debtor is regarded as impliedly representing his intention to use the funds accordingly. Failure to use the funds would be evidence of a misrepresentation of that intent under § 523(a)(2)(A).
...
Here, the Debtor did not represent that specific debts had been incurred which required payment. He instead said only that he needed funds to continue the job. But the substance is the same, at least in the particular circumstances here. I find that in requesting the funds and in saying what he did, the Debtor impliedly represented that the funds would be used on the job, and that the Plaintiffs relied on that representation.
Id. (citation omitted); see also Merchs. Nat'l Bank & Trust Co. of Indianapolis v. Pappas (In re Pappas), 661 F.2d 82, 86 (7th Cir. 1981) (stating "where the [debtor] is entrusted with money to be used for a specific purpose, and he has no apparent intention of using the money for that purpose, then a misrepresentation clearly exists upon which a debt can be properly held nondischargeable").
Based on the foregoing authority, the bankruptcy court should have considered whether, in representing to the DeWitts that they would "fund" their own project and that their milestone payments and deposits would be used to "leverage subcontractors," Stewart was, at a minimum, impliedly representing that their monies would be used exclusively on their project. We conclude that even if Stewart did not explicitly represent he would apply the DeWitts' monies exclusively to their project, the record, viewed as a whole, supports a conclusion that he impliedly made such false representations. The bankruptcy court committed clear error when: (1) it did not analyze whether Stewart obtained the DeWitts' money through false pretenses; and (2) it did not find that the DeWitts proved that Stewart obtained their money through false pretenses.
C. The Intent to Deceive Element
The most compelling evidence regarding Stewart's intent to deceive is Lessard's testimony that he was "not proud" of his conduct or that of the other Boardwalk employees in connection with the DeWitt project. He admitted that they had been "elusive or deceitful," that they were "blowing a lot of smoke and clouds" to conceal Boardwalk's financial problems, and that Stewart directed them to start milestones for the purpose of generating payments for Boardwalk's benefit. He also testified that leveraging of subcontractors never occurred.
This evidence contradicts the bankruptcy court's findings that: Stewart "[n]either intended to convey false information to the DeWitts [n]or to deceive them"; and that Stewart did not "intend[ ] to mislead the DeWitts when he discussed leveraging subcontractors." Based on the totality of this record, we have "a strong, unyielding belief that a mistake has been made." United States v. Nuñez, 852 F.3d at 144. Stewart's statements regarding his intended application of the DeWitts' funds, his plans to use their monies to leverage subcontractors, and his representation regarding his relationships with subcontractors, were all made with the intent to deceive.
D. The Reliance Element
On appeal, Stewart does not challenge the DeWitts' assertion that they relied on his false representations. Therefore, he has waived on appeal any issue relating to the elements of actual and justifiable reliance.
*440 [16] Hamilton v. Dineen, 17 F. App'x 7, 8 (1st Cir. 2001) (stating "failure to argue an issue on appeal waives that issue") (citation omitted).[17]
E. The Injury Element
Because it concluded that Stewart was not guilty of any misrepresentations, the bankruptcy court did not make any findings regarding the injury element. Nonetheless, the record amply supports a conclusion that the DeWitts-who paid 90% of the contract price for a renovation project only 45% complete-suffered harm. Indeed, on appeal, Stewart does not challenge the DeWitts' assertion that they were harmed, except that he maintains that any harm was not deliberate.
F. The DeWitts Satisfied Their Burden
In light of the record reviewed in its entirety, the bankruptcy court's account of the evidence is implausible. The foregoing analysis establishes that the DeWitts proved, by a preponderance of the evidence, that: (1) Stewart explicitly misrepresented that he would use their money only on their project, that making milestone payments in advance would enable him to leverage subcontractors for the benefit of their project, and that he had excellent relationships with subcontractors; (2) Stewart intended to deceive the DeWitts; (3) Stewart intended to induce the DeWitts to rely on his misrepresentations; (4) the DeWitts actually relied on Stewart's misrepresentations; (5) the DeWitts' reliance was justifiable; and (6) the DeWitts were harmed. Thus, the appellate record demonstrates that each and every element of § 523(a)(2)(A) is present and has been proven, and that the bankruptcy court committed clear error when it concluded that "any liability Stewart owes to the DeWitts should not be excepted from discharge pursuant to § 523(a)(2)(A)."
III. Piercing the Corporate Veil
Although we conclude that the bankruptcy court committed reversible error when it determined that Stewart did not make any false representations, that conclusion does not automatically result in a determination that Stewart owes a nondischargeable obligation to the DeWitts. We are still left with the issue of Boardwalk's corporate status and whether Stewart, under a veil-piercing theory, has personal liability to the DeWitts that may be excepted from discharge under § 523(a)(2)(A). As noted, supra, that statute provides that "[a] discharge under section 727 ... does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent *441 obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. § 523(a)(2)(A) (emphasis added).
Under New Hampshire law, corporate officers, directors, and shareholders are not liable for a corporation's debts. See Antaeus Enters., Inc. v. Davidson, 774 F.Supp.2d 409, 415 (D.N.H. 2011). A plaintiff seeking to impose individual liability on them must, therefore, first pierce the corporate veil. See id. Thus, to succeed on their claim for a discharge exception against Stewart under § 523(a)(2)(A), the DeWitts must show that he is personally liable to them for Boardwalk's obligation by piercing Boardwalk's corporate veil consistent with New Hampshire law. "When [New Hampshire] courts pierce the corporate veil, they 'assess individual liability where the owners have used the corporate identity to promote injustice or fraud.' " New Eng. Homes, Inc. v. R.J. Guarnaccia Irrevocable Trust, 150 N.H. 732, 846 A.2d 502, 506 (2004) (quoting Norwood Grp. v. Phillips, 149 N.H. 722, 828 A.2d 300 (2003) ). "They 'disregard the fiction that the corporation is independent of its stockholders and treat the stockholders as the corporation's alter egos.' " Id. (quoting Norwood Grp., 828 A.2d at 302 ) (internal quotations omitted). "New Hampshire courts do not 'hesitate[ ] to disregard the fiction of the corporation' when circumstances would lead to an inequitable result." Terren v. Butler, 134 N.H. 635, 597 A.2d 69, 72 (1991) (citation omitted).
"Given this standard," the bankruptcy court "assume[d], without deciding," that Boardwalk's corporate veil had been pierced. In re Stewart, 2017 WL 3601196, at *9. The court reasoned that "[b]oth the New Hampshire veil-piercing standard and the elements [of] § 523(a)(2)(A) and (a)(6)... involve fraud and injustice, generally." "Under the specific facts of this case," the bankruptcy court further observed, "it would be difficult to find the elements of the § 523(a) claim satisfied but not the elements of the veil piercing-standard." In re Stewart, 2017 WL 3601196, at *9 (footnote omitted). We agree.
In addition to demonstrating that the DeWitts satisfied their burden under § 523(a)(2)(A), the record before us provides a sufficient basis to support a conclusion that Stewart used the corporate identity of Boardwalk to promote an injustice and/or a fraud on the DeWitts. Moreover, the record establishes that Stewart was the sole officer, director and shareholder of Boardwalk. From the inception of his relationship with the DeWitts, Stewart used the corporate identity of Boardwalk to induce the DeWitts into doing business with him through Boardwalk. Indeed, when the parties first met, Stewart was promoting Boardwalk at a booth he erected at a home show. At that time, Stewart represented that Boardwalk was well qualified to undertake a renovation project of the magnitude of the DeWitts', that Boardwalk's business was thriving, and that Boardwalk had the ability to retain subcontractors. On the basis of Boardwalk's purported professional and financial qualifications, the DeWitts entered into both the Design Agreement and the Purchase Agreement with Boardwalk, and paid all of the milestone payments and deposits to Boardwalk. Stewart then deposited those monies into Boardwalk's general account and, instead of applying those sums solely to the DeWitts' project, he used a significant portion to satisfy the corporate obligations of Boardwalk, to pay himself a salary, and to pay his wife's credit card debt. Thus, the record shows that Stewart used Boardwalk's corporate form to promote an injustice against the DeWitts. Under these circumstances, the record supports piercing Boardwalk's corporate veil under New Hampshire law.
*442 CONCLUSION
Based on the foregoing, we REVERSE the Judgment as to Counts I and VIII,[18] and REMAND to the bankruptcy court for further proceedings consistent with this opinion, including, but not limited to, the entry of judgment in favor of the DeWitts as to those Counts.[19]

As discussed, infra, although the DeWitts contracted with Boardwalk North ("Boardwalk"), in the underlying adversary proceeding they sought to impose personal liability upon Stewart by piercing Boardwalk's corporate veil.

Unless otherwise noted, all references to "Bankruptcy Code" or to specific statutory sections are to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101 etseq.

Because we conclude the record establishes that the DeWitts satisfied their burden under § 523(a)(2)(A), we do not examine the propriety of the bankruptcy court's findings and rulings under § 523(a)(6).

Throughout this opinion, dollar amounts are frequently rounded to the nearest dollar.

These milestones included, for example, the "start of master bedroom addition demolition," the "start of master bedroom addition excavation," the "start of kitchen cabinets installation," and the "start of kitchen appliance delivery," to name a few.

The counts in the Amended Complaint are: (I) piercing the corporate veil; (II) breach of contract; (III) breach of covenant of good faith and fair dealing; (IV) negligence; (V) conversion; (VI) fraudulent misrepresentation and actual fraud; (VII) violation of N.H. Rev. Stat. Ann. § 358-A; (VIII) § 523(a)(2)(A); (IX) § 523(a)(2)(B); (X) § 523(a)(4); (XI) § 523(a)(6); (XII) § 727(a)(2); and (XIII) § 727(a)(4).

For the sake of clarity, some explanation regarding the narrowing of issues for trial is required. On August 18, 2016, the bankruptcy court granted Stewart's motion for summary judgment as to Counts IX (§ 523(a)(2)(B) ) and X (§ 523(a)(4) ), but deferred entering a final judgment on those Counts until after trial. (The Final Judgment which is the subject of this appeal includes Counts IX and X, as discussed on page 429-30, infra ). On November 22, 2016, the court further pared the claims under consideration when it issued a scheduling order that deferred the trial on the state law counts, based on jurisdictional concerns. That order provided:
The Court will hear the §§ 523 and 727 counts first. At that time, the Court will hear all evidence necessary to determine whether the Debtor is entitled to a discharge and whether the Debtor's debts to the Plaintiffs are dischargeable. During this first phase of the trial the Court will not hear evidence that is exclusively relevant to the state law counts and will not hear evidence on the liquidation of the amount of any money damages. All evidence relating to the state law counts and any evidence necessary for the Court to enter a money judgment in favor of the Plaintiffs will be deferred until the second phase of the trial. At the conclusion of the first phase of the trial, the Court will enter a ruling on the §§ 523 and 727 counts and will thereafter schedule the second phase of the trial if the Court finds it necessary and appropriate.
On February 23, 2017, the bankruptcy court entered an order granting Stewart's motion for judgment on partial findings with respect to the DeWitts' claims under § 727(a)(2) (Count XII) and § 727(a)(4) (Count XIII), and denying that motion with respect to the DeWitts' claims under § 523(a)(2)(A) (Count VIII) and § 523(a)(6) (Count XI).

See testimony of Brian Lessard, infra, indicating those relationships were actually strained.

Although Mrs. DeWitt testified that the contract price was $1,650,000, the actual price stated on the Purchase Agreement was $1,649,936.

The DeWitts claim that this email was "ghost-written" by Stewart.

This testimony is an excerpt from Lessard's deposition, which he read into the record upon request during the trial.

The record is unclear as to whether the contemplated bankruptcy filing was for Boardwalk as well as Stewart, individually.

As noted, supra, the bankruptcy court granted summary judgment in favor of Stewart on Count IX, the DeWitts' § 523(a)(2)(B) claim. See n.8.

See Bezanson v. Fleet Bank-NH, 29 F.3d 16, 21 (1st Cir. 1994) (associating the "more-likely-than-not prospect" with the preponderance of the evidence standard) (citation omitted) (internal quotations omitted).

Because the bankruptcy court found that actual reliance was lacking, it never reached the question of whether the DeWitts' reliance was justifiable.

Even if we did not deem the reliance issue waived, we would still conclude-contrary to the bankruptcy court's finding-that the DeWitts satisfied their burden regarding the reliance element. There is abundant unrebutted evidence in the record to support the DeWitts' claim that they actually relied on Stewart's misrepresentations, and that their reliance was justifiable. The DeWitts repeatedly testified that they would not have hired Boardwalk had they understood its true financial condition and that they would not have made payments had they known their money was not being applied exclusively to their project. Furthermore, in concluding that the DeWitts did not satisfy their burden on the reliance element, the bankruptcy court overlooked the First Circuit's guidance in Goguen, supra. There, the First Circuit observed that a misrepresentation that induces the creditor to "stay[ ] the course" rather than "exercise a right arising from the contract may make the debtor's debt nondischargeable." In re Goguen, 691 F.3d at 69, 70 (citing Field v. Mans, 157 F.3d 35, 39, 42-46 (1st Cir. 1998) ).

As the DeWitts have not addressed Counts II through VII, IX, X, XII, and XIII in their statement of issues on appeal, in their brief, or during oral argument, their appeal as to those Counts is waived. See Tower v. Leslie-Brown, 326 F.3d 290, 299 (1st Cir. 2003) ("[W]e have made it abundantly clear that failure to brief an argument does, in fact, constitute waiver for purposes of appeal.") (citations omitted); see also Above-All Transp., Inc. v. Fraher (In re Fraher), BAP No. MB 16-026, 2017 WL 715059, at *4 (1st Cir. BAP Feb. 21, 2017) ("Failure to list an issue in the statement of issues and/or to brief the issue with reasoned arguments may [ ] result in waiver.") (citations omitted). Moreover, a determination of the other Counts is unnecessary in light of this ruling.

An issue confronting the bankruptcy court on remand is the question of damages, see In re Cambio, 353 B.R. at 32-34, and whether the bankruptcy court should: (1) enter a monetary judgment for the DeWitts in the amount of their proof of claim; (2) conduct a hearing to assess damages; or (3) direct the DeWitts to proceed to obtain an assessment of damages in state court. We do not opine here as to which option the bankruptcy court should pursue.